## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

STEPHEN LAMPF and LAMPF,                                    CASE NO.: 9:24-cv-80357-DMM
LIPKIND, PRUPIS & PETIGROW, P.A.,

      Plaintiffs,

v.

WARREN R. TRAZENFELD; and
JAMES C. SAWRAN; and HUSNI A.
CHARARA; and IRA A. ZUCKER; and
GLADIOLUS SURGERY CENTER,
L.L.C., a Florida limited liability
company; and SURGICAL CARE
AFFILIATES, INC., a Delaware
corporation,

      Defendants.

_____/

## SECOND AMENDED COMPLAINT

      COME NOW the above-named Plaintiffs, STEPHEN LAMPF ("Lampf") and LAMPF,

LIPKIND, PRUPIS & PETIGROW, P.A. (hereinafter "LLPP" or "the Firm") (collectively

"Plaintiffs"), and sue WARREN R. TRAZENFELD and JAMES C. SAWRAN and HUSNI A.

CHARARA and IRA A. ZUCKER and GLADIOLUS SURGERY CENTER, L.L.C., a Florida

limited liability company, and SURGICAL CARE AFFILIATES, INC., a Delaware corporation,

for malicious prosecution, with punitive damages, and state as follows:

[This space intentionally left blank]

1

**TABLE OF CONTENTS**

Heading                                                                                                    Page

GENERAL ALLEGATIONS (¶ 1-200) ............................................................................... 3

COUNT **I**: MALICIOUS PROSECUTION (Plaintiffs against GLADIOLUS SURGERY
CENTER, L.L.C.) (¶ 201-220) .................................................................................... 35

COUNT **II**: MALICIOUS PROSECUTION (Plaintiffs against SURGICAL CARE
AFFILIATES, INC. a/k/a SCA HEALTH) (¶ 221-244) ............................................. 38

COUNT **III**: MALICIOUS PROSECUTION (Plaintiffs against HUSNI A. CHARARA
and IRA A. ZUCKER) (¶ 245-266) .............................................................................. 43

COUNT **IV**: MALICIOUS PROSECUTION (Plaintiffs against WARREN R.
TRAZENFELD) (¶ 267-293) ......................................................................................... 48

COUNT **V**: MALICIOUS PROSECUTION (Plaintiffs against JAMES C. SAWRAN)
(¶ 294-311) ....................................................................................................................... 54

DEMAND FOR JURY TRIAL (¶ 312) ............................................................................... 57

EXHIBIT A ......................................................................................................................... 60

EXHIBIT B ......................................................................................................................... 61

EXHIBIT C ......................................................................................................................... 62

## **GENERAL ALLEGATIONS**

A. Jurisdiction, Parties, Venue, and Conditions Precedent

1.  This is an action for damages in excess of $75,000.00, exclusive of interest, attorney's fees, and costs, between citizens of different States. 28 U.S.C. § 1332(a)(1).

2.  There is complete diversity of citizenship in that no Plaintiff has the same citizenship as any Defendant. Plaintiffs are all citizens of New Jersey. Defendants are all citizens of Florida, Delaware, or Illinois.

3.  This Court has jurisdiction based on the foregoing factors giving rise to federal diversity jurisdiction.

4.  Plaintiff STEPHEN LAMPF ("LAMPF") is a resident and citizen of New Jersey. At all times material hereto, LAMPF was an attorney licensed in New Jersey.

5.  At all times material hereto, Plaintiff LAMPF, LIPKIND, PRUPIS & PETIGROW, P.A. ("the Firm" or "LLPP") was a New Jersey corporation, organized as a professional corporation under NJ Rev. Stat. § 14A:17-5 and the Business Corporation Act of New Jersey (Title 14A, Corporations, General, of the New Jersey Statutes). As a citizen of New Jersey, LLPP was incorporated in New Jersey, with its principal place of business in that state. At all times, all shareholders and officers of LLPP were residents and citizens of New Jersey.

6.  At all times relevant hereto, Defendant WARREN R. TRAZENFELD ("TRAZENFELD") was a lawyer and a member of The Florida Bar. TRAZENFELD is a citizen of Florida, and his office is within the geographic bounds of the Southern District of Florida.

7.  At all times relevant hereto, Defendant JAMES C. SAWRAN ("SAWRAN") was a lawyer and a member of The Florida Bar. SAWRAN is a citizen of Florida and his office is or was within the geographic bounds of the Southern District of Florida.

8.  At all times relevant hereto, Defendant HUSNI A. CHARARA ("Dr. CHARARA")

3

was a podiatric physician licensed in Florida. Dr. CHARARA is a citizen of Florida.

9.    At all times relevant hereto, Defendant IRA A. ZUCKER ("Dr. ZUCKER") was a medical doctor licensed in Florida. Dr. ZUCKER is a citizen of Florida.

10.    At all times relevant hereto, Defendant GLADIOLUS SURGERY CENTER, L.L.C. ("GLADIOLUS"), was an active Florida limited liability company operating an ambulatory surgery center with its principal place of business in Fort Myers, Florida. GLADIOLUS is a citizen of Florida and its members are citizens of Florida. At the time of this Complaint, state records reflect that Todd Atkinson, Daniel Riggs, Douglas Stevens, and Micol Weissman are the managing members of the LLC, and all are citizens of Florida.

11.    SURGICAL   CARE   AFFILIATES,   INC.   (hereinafter   "SCA")   is   a   Delaware corporation with corporate headquarters in Deerfield, Illinois. Thus, it is a citizen of Illinois and Delaware. Currently branded as SCA Health, it is a national surgical solutions provider.

12.    Dr. CHARARA and Dr. ZUCKER held major ownership interests in GLADIOLUS until April 2016. On or about April 1, 2016, a 50% controlling ownership interest in GLADIOLUS was acquired by SURGICAL CARE AFFILIATES, INC. ("SCA"), for about nine million dollars, buying out Dr. CHARARA's and Dr. ZUCKER's interests for about four million dollars. SCA became the managing member.

13.    Pursuant to §48.193(l)(a)(2), Fla. Stat., SCA, personally or through an agent, submitted itself to the jurisdiction of the courts in this state, including but not limited to this federal Court, since a cause of action arose from committing a tortious act within this state.

14.    Additionally  and  alternatively,  pursuant  to  §  48.193(l)(a)(6)(a),  Fla. Stat., SCA, personally or through an agent, submitted itself to the jurisdiction of the courts in this state, including but not limited to this federal Court, since causes of action arose from SCA's causing injury within this state arising out of an act or omission by SCA within or outside this state; at or

about the time of the injury, SCA was engaged in solicitation or services within this state.

15.   Additionally and alternatively, pursuant to § 48.193(2), Fla. Stat., SCA engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, subjecting SCA to the jurisdiction of the courts in this state (including this federal Court), whether or not the claim arises from that activity.

16.   Venue is proper here in the United States District Court for the Southern District of Florida because: (**a**) multiple individual Defendants including TRAZENFELD and SAWRAN reside within the Southern District of Florida; (**b**) the acts or omissions complained of substantially occurred within the area of this Southern District, in Palm Beach County, Florida; (**c**) the causes of action sued upon herein accrued in Palm Beach County, Florida, where the January 30, 2015 lawsuit by GLADIOLUS (against LLPP and LAMPF, et al.) giving rise to the instant malicious prosecution claim, was filed; and (**d**) GLADIOLUS' January 2015 lawsuit in the 15th Judicial Circuit of Florida made allegations against LLPP and LAMPF, et. al, in relation to LLPP's and LAMPF's (and others') alleged acts in a prior federal lawsuit filed on December 15, 2010 here in the United States District Court for the Southern District of Florida.

17.   All conditions precedent necessary to initiate this action have been satisfied and fulfilled or are deemed waived.

### B. Nature of This Action

18.   Plaintiffs LLPP and LAMPF hereby assert that Defendants engaged in malicious prosecution of LLPP and LAMPF in a civil matter. The malicious litigation was filed by TRAZENFELD, at the behest of Dr. CHARARA and Dr. ZUCKER, on behalf of GLADIOLUS, on January 30, 2015, in the 15th Judicial Circuit of Florida, and SAWRAN assisted TRAZENFELD in initiating the baseless litigation.

19.   GLADIOLUS' January 30, 2015 lawsuit was brought maliciously, and knowingly

made meritless and false accusations against LLPP and LAMPF regarding their representation of GLADIOLUS in a prior federal case filed here in the Southern District in December 2010.

### C. GLADIOLUS' MUA Practice and Partnership with Expert Billing

20.  On or about October 24, 2007, GLADIOLUS became associated with C2 Medical, LLC ("C2 Medical"), managed by Carolyn Via (also known as Carolyn Liva or Carol Liva), Edward Liva ("Ed Liva"), and Christopher Liva ("Chris Liva"). From about October 24, 2007, to about March 16, 2010, C2 Medical held a 20% interest in GLADIOLUS (acquired for one million dollars), making it the largest owner.

21.  On or about October 24, 2007, GLADIOLUS, through its co-managing member Dr. CHARARA, entered a Billing and Collection Agreement providing for Expert Billing, LLC ("Expert Billing," controlled by Carol and Ed Liva), to receive 15% of all Manipulation Under Anesthesia ("MUA") receipts. Expert Billing was also associated with another company of which Carol Liva was the managing member, Physicians Surgical Group, L.L.C.

22.  On October 24, 2007, GLADIOLUS and its administrator Lorraine Ambrose and Dr. CHARARA and Dr. ZUCKER agreed to pay another entity associated with Ed Liva, Physician's Marketing and Management, LLC, $25,000 per month for marketing the MUA procedures (and a separate agreement paying 5% of MUA receipts, for managing the MUA procedures) that were performed at Gladiolus Surgery Center.

23.  MUAs were referred to GLADIOLUS by chiropractors under the Livas' direction, with Ed Liva insisting that GLADIOLUS go "out of network" in order to obtain large facility fees of about $35,000 per MUA procedure.

24.  Between June 2007 and June 2009, GLADIOLUS netted about $15 million in income from MUAs, billed at $35,000 each, after paying over $6.5 million to the Liva entities, a significant increase from prior earnings. During that period, GLADIOLUS' net profit margin

soared to about 65%, well above the national average of 27% for surgery centers, making it one of the most profitable in the United States.

25.  However, on November 30, 2018, the Circuit Court of the Fifteenth Judicial Circuit, in and for Palm Beach County, Florida, ruled in case 502015CA001162XXXXMB (the "State Case") that GLADIOLUS' arrangements with the Liva Entities constituted an illegal kickback, fee-splitting, and patient-brokering scheme in which Dr. CHARARA and Dr. ZUCKER knowingly engaged for financial gain.

D. GLADIOLUS' Retainer of LLPP via Expert Billing

26.  On October 24, 2007, consistent with the fact that law firms typically interact with billing/collection agencies rather than directly with the healthcare entities they represent on collections matters, GLADIOLUS entered into a Billing & Collection Agreement with Expert Billing, for Expert Billing to "conduct[ ] on a regular basis" billing and collection services for Gladiolus, including "Appeals" and "Bad Debt Collection/Attorney cases."

27.  The October 24, 2007, agreement constituted GLADIOLUS' consent for Expert Billing to retain law firms, including LLPP and LAMPF, for MUA litigation.

28.  Carolyn Via (a/k/a Carol Liva) of Expert Billing and Dr. CHARARA of GLADIOLUS signed this agreement and two other agreements, authorizing her to hire lawyers and engage legal representation for collections litigation on behalf of GLADIOLUS.

29.  In late February 2010, Sanctuary Surgical Centre, LLC ("Sanctuary") and its legal team met with LAMPF, Ed Liva, Chris Liva, and Mark Fritz (CFO of Physicians Surgical Group), wherein it was agreed to hire and retain LLPP to sue the carriers to try to collect the MUA receivables and to stop the rampant offsetting that was being done by Blue Cross and United Healthcare.

30.  On July 15, 2010, pursuant to Expert Billing's or Carol Liva's authority to pursue

7

"Bad Debt Collection/Attorney cases" on behalf of GLADIOLUS, along with Sanctuary, LLPP was engaged for legal representation against insurance companies like Blue Cross Blue Shield and UnitedHealthcare ("UHC") for MUA procedure reimbursements. The engagement letter had a minor typographical error in GLADIOLUS' name, listing it as "Gladiolus Surgical."

31.  The engagement agreement called for GLADIOLUS jointly and severally to pay LLPP at half their standard rate against a 30% contingency fee, with no billing by LAMPF.

E. <u>Cessation of Coverage for MUA Procedures, and Initiation of Offsets</u>

32.  In late 2008, Blue Cross and UHC started reducing payments for MUA procedures and subsequently stopped paying for MUAs entirely. Despite earlier recognizing coverage for MUAs, the carriers then claimed MUAs were not medically necessary or otherwise not covered.

33.  In October 2008, UHC sent demand letters to GLADIOLUS and Sanctuary, seeking to recoup the payments it had made for MUA procedures. The demand to Sanctuary was over $5 million. Similar amounts were demanded from Gladiolus.

34.  By early 2009, Blue Cross and UHC began imposing offsets by reducing payments on other patients' subsequent claims not related to MUAs, to recoup funds from MUA claims paid to GLADIOLUS and the doctors.

35.  GLADIOLUS and Sanctuary, fully aware of the offsetting, complained to their agent/partner Expert Billing.

36.  On March 15, 2010, Ed Liva, Chris Liva, and Mark Fritz met with Jeff Cohen, Esquire, at the Florida Healthcare Law Firm in Delray Beach, Florida. Cohen, a Florida lawyer specializing in healthcare law, provided a legal opinion stating the offsets by Blue Cross and UnitedHealthcare were unlawful because GLADIOLUS was out-of-network and had no written contract with the insurance companies (much less any contract allowing offsetting) and there was no statutory basis for the offsetting under Florida law.

8

37.  On March 16, 2010, Mark Fritz informed Ms. Ambrose, Gladiolus's administrator, that attorney Jeff Cohen had advised the offsetting was unlawful, and forwarded Mr. Cohen's March 15, 2010 legal opinion to Ms. Ambrose.

38.  On March 24, 2010, LAMPF called Cohen, discussing Blue Cross and UnitedHealthcare's offsetting. Cohen reiterated his advice for GLADIOLUS to have counsel contact the insurers about the illegality of the offsetting; and, if unsuccessful, to litigate.

39.  Ed Liva informed LAMPF of his discussion with Dr. CHARARA, who insisted on sending letters to challenge the insurance carriers.

40.  On June 10, 2010, LAMPF, Fritz, and Ed Liva prepared a letter for Blue Cross and UHC on behalf of GLADIOLUS (and Sanctuary), disputing the repayment demands.

41.  On July 26, 2010, Fritz sent letters to Blue Cross and UHC on behalf of GLADIOLUS and Sanctuary, rejecting their demands for repayment of MUA procedure costs.

42.  Despite numerous letters to Blue Cross and UHC, the offsetting persisted. By the end of 2010, the insurers were offsetting about $100,000 monthly, totaling over $1.5 million from GLADIOLUS and Sanctuary.

43.  GLADIOLUS received advice from three healthcare law firms, including LLPP, to the effect that the only way to stop the offsetting was to sue the carriers.

F. GLADIOLUS Requests that LLPP and LAMPF File Suit

44.  In the spring of 2010, Dr. CHARARA told Ed Liva (who managed and controlled Expert Billing) that Dr. CHARARA wanted to join with Sanctuary to have LLPP file lawsuits on behalf of GLADIOLUS to stop the offsetting and collect the outstanding MUA accounts receivable of about $9 million dollars in unpaid MUA billings. Notably, Dr. CHARARA stated that he did not need to see any of the court filings.

45.  Therefore, on or about July 15, 2010, Carol Liva, Executive Director of Expert

Billing (agent of GLADIOLUS) signed the engagement agreement on behalf of GLADIOLUS for LLPP to also serve as legal counsel for GLADIOLUS and file lawsuits against the four insurance carriers. Soon thereafter, Dr. CHARARA had GLADIOLUS transfer the MUA patient and billing records to Expert Billing, to be sent to LLPP. LLPP received about 8 banker's boxes.

46.  At that time, LLPP was an active New Jersey law firm specializing in tax, ERISA, and health care matters, with 14 of its 18 attorneys limiting their practices to those areas. LAMPF has been a lawyer in New Jersey since 1970. LAMPF was also a CPA and worked with a national accounting firm and served five years as an IRS revenue agent and appeals officer.

47.  Carol Liva, of Expert Billing, LLC, the billing agent and authorized representative of GLADIOLUS, had actual and/or apparent authority to retain LLPP and LAMPF pursuant to Expert Billing's "Billing & Collection Agreement" with GLADIOLUS.

48.  GLADIOLUS had prior notice of LLPP's legal representation of Sanctuary through Dr. CHARARA's statement (as managing member of GLADIOLUS) to Ed Liva about Dr. CHARARA's desire to join Sanctuary in having LLPP sue the insurance carriers on behalf of GLADIOLUS. LLPP was thereafter retained by Expert Billing acting as GLADIOLUS' agent.

49.  Thus, at least by about June 2010—several months before LLPP's filing of the 2010 Federal Collection Actions—GLADIOLUS was aware that those actions would be filed by LLPP on behalf of GLADIOLUS.

50.  Based upon that knowledge and the lack of any objection by GLADIOLUS, GLADIOLUS gave its implied authorization and consent and ratified its agent Carol Liva's or Expert Billing's retention of LLPP as legal counsel for GLADIOLUS and Sanctuary to pursue litigation against the insurance carriers.

G. The Six Federal Matters

51.  Accordingly, Expert Billing (as the authorized agent of GLADIOLUS), asked LLPP

10

to file (through local counsel Raskin & Raskin) two actions here in the Southern District of Florida against insurance carriers in late 2010, as follows: (**a**) against Blue Cross in October 2010 (*Sanctuary Surgical Center, LLC, et al. v. Blue Cross and Blue Shield of Florida, Inc*., case no. 9:10-cv-81260-DTKH, filed on October 27, 2010) ("Action Against Blue Cross"); and (**b**) against United Healthcare, Inc. and other insurance carriers in December 2010 (*Sanctuary Surgical Centre, Inc., et al. v. United Healthcare, Inc., et al.*, case no. 9:10-cv-81589-DTKH, filed on December 15, 2010) (hereinafter the "Action Against UHC").

52.  Collectively, the two foregoing lawsuits in late 2010 (the Action Against Blue Cross and the Action Against UHC) are hereinafter referred to as the "2010 Federal Collection Actions." On behalf of about 75 chiropractors, GLADIOLUS and Sanctuary aimed to recover millions of dollars in unpaid or underpaid MUA facility fees through these lawsuits.

53.  After Aetna and Cigna, et al., were severed from the Action Against UHC on or about May 27, 2011, actions were filed on behalf of GLADIOLUS, et al., against those insurers separately: (**a**) against Aetna, Inc., in July 2011 (*Sanctuary Surgical Centre, LLC et al v. Aetna Inc*., case no. 9:11-cv-80799-DTKH, filed on July 11, 2011); and (**b**) against Cigna Healthcare of Florida, Inc., Cigna Healthcare, Inc., and Connecticut General Life Insurance Company, Inc. (*Sanctuary Surgical Centre, LLC et al. v. Cigna Healthcare of Florida, Inc., et al*., case 9:11-cv-80800-DTKH, filed on July 11, 2011).

54.  Collectively, the two foregoing lawsuits filed in July 2011 are hereinafter referred to as the "2011 Federal Collection Actions."

55.  Collectively, the four foregoing lawsuits against insurance carriers in paragraphs 51 and 53 are referred to as the "Four Federal Collection Actions." Of those four, the most pertinent to the instant lawsuit is the December 15, 2010 Action Against UHC. (The relevant United Healthcare companies involved in the litigation are collectively referred to herein as "UHC.")

11

56. LLPP and Lampf also defended GLADIOLUS and Sanctuary in the following cases: (**a**) *Thomas, et al v. Blue Cross, et al.*, case no. l:03-cv-21296-FAM; and (**b**) *United Healthcare Services, Inc. v. Sanctuary Surgical Centre, Inc., et al*., case no. 9:10-cv-81589-DTKH. Collectively, these two defensive matters are referred to as the "Federal Defensive Actions."

57. Collectively, the overall group of the Four Federal Collection Actions plus the two Federal Defensive Actions are referred to as the "Six Federal Matters."

58. The goal of the Four Federal Collection Actions was to help GLADIOLUS collect approximately nine million dollars in MUA receivables from Blue Cross, UHC, Aetna, and Cigna, and to stop the rampant and unlawful offsetting by Blue Cross and UHC.

59. The 2010 Federal Collection Actions were filed by local counsel Raskin & Raskin in association with LLPP. On or about January 7, 2011, LAMPF and another attorney with LLPP were admitted *pro hac vice* in the Action Against UHC as lead counsel for GLADIOLUS and Sanctuary and numerous doctors associated with those surgery centers.

60. LAMPF was also admitted *pro hac vice* as lead counsel for GLADIOLUS in the Action Against Blue Cross and, eventually, in all of the Four Federal Collection Actions. He and LLPP provided valuable legal services for the benefit of GLADIOLUS.

61. In sum, Expert Billing properly engaged LLPP for the 2010 Federal Collection Actions on behalf of GLADIOLUS as authorized by the Billing & Collection Agreement and as requested by Dr. CHARARA and ratified by GLADIOLUS and its administrator Ms. Ambrose and principal co-owners/physicians, including Dr. CHARARA and Dr. ZUCKER.

H. The *Outpatient Surgery* Magazine Article

62. At the very latest, GLADIOLUS knew about the 2010 Federal Collection Actions through its principals' and administrator's receipt of a magazine article about the lawsuit (and discussing the article with Ed Liva) within seven (7) weeks after the December 15, 2010 filing of

the Action Against UHC.

63.  The article was published in *Outpatient Surgery* magazine on February 8, 2011, entitled "ASCs Sue Insurers for Denying Manipulation Under Anesthesia Claims: 2 Florida facilities that performed chiropractic procedure are seeking 'many hundreds of thousands of dollars'."  (*See* article attached hereto as **Exhibit "A"**.)

64.  Dr. Abbott Kagan, one of the four major principals of GLADIOLUS at that time, received an alert from *Outpatient Surgery* magazine on the day the article was published, February 8, 2011. Dr. Kagan read the article. Then he forwarded the article by e-mail to Dr. CHARARA and Dr. ZUCKER, and upon information and belief they also read the article.

65.  Dr. ZUCKER then forwarded the article on February 8, 2011 to GLADIOLUS' administrator, Ms. Lorraine Ambrose. Upon information and belief, Ms. Ambrose read the article. Then she forwarded the e-mail and article to Chris Liva that same day, at 4:23 p.m. (*See* **Exhibit B** hereto).

66.  On March 3, 2017, Dr. ZUCKER testified in his deposition in the Florida State Case[1] that he had sent the *Outpatient Surgery* article to Ms. Ambrose and that Ms. Ambrose acknowledged that she received it and forwarded it to Chris Liva. (Notably, Ms. Ambrose had been made CEO of GLADIOLUS after the acquisition by SCA in April 2016.)

67.  That night, February 8, 2011, Ms. Ambrose spoke with Ed Liva on the phone, on her private phone number. Subpoenaed AT&T telephone records (dated April 25, 2016) show that Ms. Ambrose and Ed Liva engaged in two phone calls that night of February 8, 2011. Attached hereto as **Exhibit "C"** is page 947 of the phone records, which reflects two (2) phone calls between Ms. Ambrose/GLADIOLUS (239-470-1944) and Ed Liva (561-445-7303) which were

---

[1] Florida "State Case" refers to case no. 502015CA001162XXXXMB in the 15th Judicial Circuit of Florida, filed by GLADIOLUS against LLPP and LAMPF on January 30, 2015.

made on February 8, 2011 at 8:25 p.m. and 9:44 p.m. Those calls lasted 10 minutes and 27 seconds, and 8 minutes and 25 seconds, respectively. Over the two-month period from January 1, 2011 and February 28, 2011, there were no other calls between Ms. Ambrose and Ed Liva lasting more than 30 seconds.

68.     The calls on February 8, 2011, took place within hours after the *Outpatient Surgery* article was discovered by Dr. Kagan, Dr. CHARARA, Dr. ZUCKER and Ms. Ambrose and was forwarded by Ms. Ambrose to Chris Liva.

69.     Upon information and belief, the conversation between Ms. Ambrose and Ed Liva concerned the *Outpatient Surgery* magazine article that she had sent to Chris Liva that afternoon, and the 2010 Federal Collection Actions which it discussed. Ms. Ambrose also told Ed Liva that Dr. CHARARA and Dr. ZUCKER were very pleased that the offsetting by Blue Cross and UHC had finally stopped after the 2010 Federal Collection Actions were filed

70.     The next day, February 9, 2011, Ed Liva called LAMPF and described Liva's conversation of the night before with Ms. Ambrose, including the discussion between Ms. Ambrose and Ed Liva about the 2010 Federal Collection Actions and Ms. Ambrose's comment that Dr. CHARARA and Dr. ZUCKER were pleased that the lawsuits had stopped the offsetting.

71.     That morning, February 9, 2011, Ed Liva had a phone call with Dr. CHARARA, who personally mentioned that the offsetting had ceased as a result of the lawsuits having been filed in October and December of 2010. Ed Liva reported Dr. CHARARA's comments to LAMPF and his law partner, Neil Prupis, that same morning.

72.     Regarding the *Outpatient Surgery* article of February 8, 2011, Mr. Liva testified that he saw it soon after GLADIOLUS received the article in their office, and "I spoke to Charara" and Dr. CHARARA said "screw the insurance company. They owe me -- the exact words he said, [']they owe me [GLADIOLUS] the f*cking money, they owe you [the Liva Entities] the

14

f*cking money, so the hell with them[']."

73. GLADIOLUS' positive, overt expressions of approval of the litigation and of LLPP's representation, after GLADIOLUS' principals and administrator had received the *Outpatient Surgery* magazine article and after the administrator and Dr. CHARARA had discussed it with Ed Liva, further ratified LLPP's and LAMPF's engagement on GLADIOLUS' behalf via Expert Billing, pursuant to the Billing & Collection Agreement.

I. <u>Results of the Federal Collection Actions on Behalf of Gladiolus</u>

74. The 2010 Federal Collection Actions aimed not only to recover millions in denied or reduced payments for MUA procedures but also to halt the massive, rampant "offsetting" of roughly $100,000.00 per month by Blue Cross and UHC. This practice involved reducing payments on claims unrelated to MUAs to recoup funds from previous MUA payments.

75. Years later, on June 18, 2022, LAMPF confirmed with Mark Fritz, then the former CFO of Physicians Surgical Group, that the offsetting persisted throughout 2010 but ceased in early 2011, within three months after the filing of the 2010 Federal Collection Actions.

76. Consequently, LLPP and LAMPF's legal intervention ended the widespread offsetting by Blue Cross and UHC, allowing GLADIOLUS to retain over four million dollars which otherwise would have been lost without the litigation.

J. <u>UHC's Counterclaim</u>

77. In October 2012, following a federal District Court mandate for the insurers to answer in the 2010 Federal Collection Actions, and amid the 2011 actions, LAMPF consulted Sanctuary's owner and Ed Liva about initiating settlement talks with the carriers. Sanctuary declined, and Ed Liva indicated Dr. CHARARA was firmly against any settlement discussions.

78. On November 6, 2012, United Healthcare Services, Inc. and UnitedHealthcare Insurance Company ("UHC") filed a counterclaim against GLADIOLUS and Sanctuary,

15

accusing them of fraudulent billing practices, in case no. 9:10-cv-81589-DTKH.

79.   On May 31, 2013 the Court dismissed GLADIOLUS' claims against UHC with prejudice. On July 26, 2013, UHC amended its counterclaim. On January 28, 2014, the Court reordered the parties, making UHC the plaintiff and Sanctuary and GLADIOLUS the defendants.

80.   On April 22, 2014, the Raskin firm moved to withdraw from representing Sanctuary and GLADIOLUS. The withdrawal was granted on May 15, 2014.

81.   On or about May 14, 2014, attorney James Sawran ("SAWRAN") appeared as local counsel for GLADIOLUS, but Dr. CHARARA requested that LLPP remain as lead counsel, in GLADIOLUS' defense against UHC's amended counterclaim.

K. The MWE Opinion

82.   Unbeknownst to LLPP, the prestigious law firm of McDermott Will & Emery had issued a legal memorandum ("MWE Opinion") six years earlier, on July 11, 2007, in response to Dr. CHARARA's and Dr. ZUCKER's request for advice as to GLADIOLUS' then-proposed business arrangements with the Liva Entities.

83.   The MWE Opinion cautioned GLADIOLUS that any marketing, billing, and collection arrangement between GLADIOLUS and its partner/agent Expert Billing, LLC, et al., paying 50%, would violate Florida law as an illegal patient-brokering, fee-splitting, and kickback scheme and could constitute tax fraud under the Internal Revenue Code. GLADIOLUS discussed the MWE Opinion with the MWE attorney, who confirmed that the referral and fee-splitting arrangement would constitute an illegal patient-brokering and kickback scheme.

L. Concealment of the MWE Opinion, and Inducement of the Livas and LLPP

84.   After reviewing the MWE Opinion in July 2007, GLADIOLUS and Dr. CHARARA and Dr. ZUCKER deceived their medical partners. Despite the MWE Opinion's warning, they proposed partnering with the Liva Entities and C2 Medical, LLC, during a GLADIOLUS board

meeting on October 24, 2007. Dr. CHARARA lied to the member physicians, claiming counsel had approved the marketing, management, and billing arrangements.

85. The Livas, who had relationships with chiropractors serving injured and debilitated persons, sought confirmation from GLADIOLUS that their business arrangements regarding MUA receipts would be lawful. GLADIOLUS and Dr. CHARARA and Dr. ZUCKER concealed the MWE Opinion from Expert Billing and C2 Medical. Dr. ZUCKER falsely assured Ed Liva that the arrangements were lawful, despite knowing of the illegality.

86. Then Dr. CHARARA and Dr. ZUCKER, on behalf of GLADIOLUS and by and through GLADIOLUS' agent, Expert Billing, induced LLPP and LAMPF to undertake the 2010 Federal Collection Actions on the ruse that their MUA account receivables were valid.

87. Thus, when LLPP was retained in 2010 (and throughout its tenure as counsel for GLADIOLUS until late 2014), LLPP and LAMPF had no idea that the MUA accounts receivables (of about $9 million) that they were retained to collect through litigation, were invalid and probably not legally recoverable.

88. However, Dr. CHARARA and Dr. ZUCKER knew—by means of having read the MWE Opinion about three years earlier in July 2007—that the MUA accounts receivables were the product of illegal kickbacks, fee-splitting, and patient brokering, and that the $6.5 million paid to the Liva Entities were largely not tax deductible for GLADIOLUS.

89. It was not until November 7, 2013, in an e-mail from Ms. Ambrose, that LAMPF even learned of the three Liva agreements and C2 Medical's 20% membership interest in GLADIOLUS as of October 24, 2007. At a meeting with Ms. Ambrose at SAWRAN's office on June 9, 2014, to prep her for UHC's June 28, 2014 deposition, Ms. Ambrose assured LAMPF that counsel had advised them that the business arrangement had been reviewed and approved.

90. Dr. CHARARA and Dr. ZUCKER failed to inform LLPP about the MWE Opinion,

and falsely assured LLPP that the arrangements with the Liva Entities were legal and had been approved by counsel. GLADIOLUS, Dr. CHARARA, Dr. ZUCKER, and Ambrose concealed the MWE Opinion from LLPP and LAMPF with the intent to harm and damage LLPP and LAMPF, both before and during the engagement and retention of LLPP and LAMPF and throughout LLPP's representation in the Four Federal Collection Actions.

91. GLADIOLUS knowingly used and benefitted from LLPP and LAMPF's valuable experience and legal services, while GLADIOLUS knew that the money for which it authorized collection litigation probably was not legally collectible because they were the fruit of illegal patient-brokering, fee-splitting, or kickback schemes, and tax fraud.

92. LLPP and LAMPF would not find out about the illegality until years later when GLADIOLUS' attorney TRAZENFELD recklessly produced the MWE Opinion in discovery in the State Case, in January 2016.

93. Had LLPP and LAMPF known that the MUA receivables were the product of ill-gotten gains, LLPP never would have become involved in litigating on behalf of GLADIOLUS (as LAMPF subsequently testified in the Florida State Case before Judge Gillen).

M. SAWRAN's Concealment of the MWE Opinion in 2014

94. On July 14, 2014, as the result of a subpoena by UHC, SAWRAN received a copy of the MWE Opinion. After reviewing it, SAWRAN urged GLADIOLUS to settle UHC's amended counterclaim.

95. However, SAWRAN, as local counsel, concealed the MWE Opinion from LLPP and LAMPF in spite of their being lead counsel. SAWRAN kept LLPP and LAMPF unaware that MWE had warned GLADIOLUS as far back as July 2007, that its agreements with Expert Billing, LLC, et. al., would violate Florida criminal law and federal tax fraud statutes.

96. On August 14, 2014, Dr. CHARARA, on advice of SAWRAN, sent LAMPF a letter

drafted by SAWRAN, terminating their legal services for GLADIOLUS. LLPP and LAMPF subsequently filed a motion to withdraw, which was granted on October 24, 2014.

### N. The MWE Opinion Led to GLADIOLUS' Settlement with UHC

97.  In November 2014, GLADIOLUS settled UHC's counterclaim, as SAWRAN had insisted after reading the MWE Opinion. The settlement called for GLADIOLUS to pay $1.8 million, with a full release for GLADIOLUS and its 17 doctor-owners.

98.  GLADIOLUS entered into the settlement with UHC largely due to its fear of the MWE Opinion being disclosed. Attorney SAWRAN, and presumably TRAZENFELD, had warned GLADIOULUS of the dire consequences, such as a loss of its facility license, being "blacklisted," and possible felony charges if the state and/or UHC ever learned of the MWE Opinion and if the IRS learned of the $6.5 million paid to the Liva Entities.

99. Dr. CHARARA and Dr. ZUCKER were motivated to conceal the illegality of Gladiolus' activity after having gained substantial personal fortunes as major owners of GLADIOLUS and through the sale of fifty percent (50%) of GLADIOLUS in April 2016 to Surgical Care Affiliates, Inc. for nine million dollars ($9,000,000), of which Dr. CHARARA and Dr. ZUCKER received a total of about four million dollars ($4,000,000).

100.  On behalf of GLADIOLUS, Dr. CHARARA and Dr. ZUCKER signed a consent judgment acknowledging that GLADIOLUS entered into the settlement "for the purpose of resolving United's claims of fraud against Gladiolus," and guaranteed payment of $1.8 million.

### O. GLADIOLUS' January 2015 Complaint Against LLPP and LAMPF

101.  Around the time of the $1.8 million settlement with UHC, attorney SAWRAN devised a scheme with Dr. CHARARA and Dr. ZUCKER to sue LLPP, LAMPF, and the Raskins. Dr. ZUCKER testified in the State Case on March 4, 2017, that SAWRAN was the one who suggested that GLADIOLUS sue LLPP and LAMPF as a way to recover funds that it would

have to pay in the settlement with UHC.

102.   Thus, on or about January 30, 2015, GLADIOLUS SURGERY CENTER, L.L.C. filed a civil lawsuit against LLPP and LAMPF in the Circuit Court for the Fifteenth Judicial Circuit in and for Palm Beach County, Florida, case number 502015CA001162XXXXMB.

103.   The State Case was captioned "GLADIOLUS SURGERY CENTER, LLC, a Florida limited liability company, Plaintiff(s), vs. RASKIN & RASKIN, P.A., a Florida professional association, MARTIN RASKIN, JANE RASKIN, LAMPF, LIPKIND, PRUPIS & PETIGROW, P.A., a New Jersey professional association and STEPHEN LAMPF, Defendant(s)" (hereinafter the Florida "State Case").

104.   The relevant Count of the Complaint, Count I, in the State Case alleged "NEGLIGENCE AGAINST THE LAMPF FIRM AND STEPHEN LAMPF," thereby commencing a judicial proceeding against LLPP and LAMPF, alleging professional negligence (not malpractice).

105.   The Complaint was filed by attorney TRAZEFELD, even though, on information and belief, TRAZENFELD was aware of the MWE Opinion and knew the arrangements with the Liva Entities were illegal before he drafted and filed GLADIOLUS' lawsuit against LLPP and LAMPF. Since SAWRAN had seen the February 8, 2011, *Outpatient Surgery* article, TRAZENFELD must have received a copy of this article from SAWRAN around the time GLADIOLUS engaged TRAZENFELD in September 2014.[2]

106.   GLADIOLUS' Complaint falsely claimed that GLADIOLUS knew nothing of the 2010 Federal Collection Actions or the legal representation by LLPP and LAMPF, until October

---

[2] During LAMPF's deposition on July 15, 2015, he was asked about Ms. Ambrose's e-mail of February 8, 2011 to Chris Liva about the *Outpatient Surgery* article. TRAZENFELD did not deny his awareness of the *Outpatient Surgery* article, but merely claimed that he did not have the Ambrose e-mail.

17, 2013, and falsely claimed that GLADIOLUS had not authorized or consented to the lawsuit.

107.   In reality, the first contact between LLPP and LAMPF and Dr. CHARARA was on or about March 25, 2010, when Ed Liva sent to Dr. CHARARA a copy of LAMPF's legal memo about his firm and the claims and defenses that could or would be asserted against the carriers. Mr. Liva had requested the memo to see if GLADIOLUS wanted to join with Sanctuary in suing the carriers to collect the MUA receivables and stop the offsetting. Thus, GLADIOLUS was aware of the actions being filed in late 2010.

108.   Moreover, GLADIOLUS was reminded of the actions on February 8, 2011, through the *Outpatient Surgery* article, and took no steps to have the suits dismissed. Rather, Dr. CHARARA told Ed Liva, the next day, that he was glad the lawsuit had stopped the offsetting.

109.   Further, LAMPF communicated directly with Dr. CHARARA and Ms. Ambrose on October 8, 2013, confirming GLADIOLUS' awareness and cooperation. The statement by Dr. CHARARA (as then co-managing member of GLADIOLUS) to LAMPF on October 8, 2013 ("I know who you [LAMPF] are, I'm aware of the lawsuit and we will fully cooperate") negated GLADIOLUS' subsequent spurious claim that GLADIOLUS was not aware of the Federal Collection Actions or the representation by LLPP and LAMPF, until almost three years after it was filed.

110.   Dr. CHARARA's early involvement in legal strategy discussions is also shown by the fact that LAMPF had vetted and discussed potential local counsel with Dr. CHARARA, and advised on the limitations of the firm of McIntosh, Sawran & Cartaya, P.A. (hereinafter the "Sawran firm") in early 2014.

111.   Despite claims of ignorance, Dr. CHARARA and Dr. ZUCKER were aware of and had authorized the legal actions well before or at least shortly after their initiation, evidenced by discussions following the circulation by GLADIOLUS' leaders of the *Outpatient Surgery* article

on February 8, 2011.

112.   When GLADIOLUS' principals read the *Outpatient Surgery* article, GLADIOLUS did nothing to complain or try to discontinue the lawsuits. The lack of any communication expressing surprise or concern after reading the article, further indicates that GLADIOLUS had known about them and LLPP's representation of GLADIOLUS since the inception in 2010. Moreover, Dr. CHARARA indicated on February 9, 2011, that he was very pleased that the 2010 Federal Collection Actions had stopped the offsetting by Blue Cross and UHC.

113.   Yet, three months after the UHC settlement, GLADIOLUS wrongfully sued LLPP, LAMPF, and the Raskins in bad faith and without a factual basis, in an unfounded and malicious attempt to recoup the settlement amount (and the related legal fees paid to the SAWRAN firm), because GLADIOLUS was upset that it had felt forced to settle UHC's amended counterclaim which alleged rampant fraudulent and improper activity by the chiropractors and GLADIOLUS.

114.   Thus, Defendants concocted and pursued the scheme of suing LLPP and LAMPF in spite of knowing that LLPP and LAMPF had acted properly and that GLADIOLUS itself had wronged LLPP and LAMPF by concealing the MWE Opinion from them, falsely telling LLPP and LAMPF that GLADIOLUS' legal counsel had declared GLADIOLUS' arrangements with the Liva Entities to be lawful, and failing to pay LLPP's legal fees.

P. Spurious Allegations in GLADIOLUS' January 2015 Complaint

115.   Some of the specific false allegations stated in Gladiolus' January 30, 2015 Complaint included those identified in the following 10 paragraphs (¶ 116-125 ([a]-[j])):

116.   [a] The first introductory paragraph spuriously claimed that LLPP and Lampf acted "without any authorization" from Gladiolus.

117.   [b] The third introductory paragraph falsely stated, "The first contact between Defendant, Lampf, Lipkind, Prupis & Petigrow, P.A., and Gladiolus was on October 17, 2013 - 2

years and 10 months after the lawsuit was filed."

118.  [c] The third introductory paragraph also falsely claimed that Gladiolus settled the lawsuit that "it never authorized."

119.  [d] Paragraph 18 spuriously alleged that "Gladiolus … had no knowledge that it was a party to the Lawsuit."

120.  [e] Paragraph 24 falsely claimed, "On October 17, 2013, … Gladiolus was *contacted for the first time* by the Lampf firm and advised of the lawsuit."

121.  [f] Paragraph 26 speciously alleged, "Prior to October 17, 2013, neither the Lampf firm nor the Raskin firm had a single communication with Gladiolus."

122.  [g] Paragraph 32 falsely claimed that "Gladiolus … settled the lawsuit filed by Defendants, *which it never authorized*…."

123.  [h] Paragraph 36 speciously claimed, "The Lampf firm and Stephen Lampf … fail[ed] to communicate with Gladiolus regarding the lawsuit and obtain its authority to file and/or proceed with the lawsuit."

124.  [i] Paragraph 37 spuriously alleged that if "the Lampf firm and Stephen Lampf had communicated with Gladiolus regarding the lawsuit, Gladiolus *would not have authorized* the lawsuit to be filed or pursued."

125.  [j] Paragraph 38 falsely alleged that "the Lampf firm and Stephen Lampf … filed and pursued the lawsuit *without the knowledge or authorization* of Gladiolus…."

126.  GLADIOLUS, Dr. CHARARA, Dr. ZUCKER, SAWRAN, and TRAZENFELD knew that those allegations were false and that the entire premise of GLADIOLUS' Complaint against LLPP and LAMPF was unfounded and that the suit was malicious and in bad faith, blaming LLPP and LAMPF for pursuing a case that GLADIOLUS (through Dr. CHARARA) had told Expert Billing to have LLPP and LAMPF pursue, and in spite of GLADIOLUS and Dr.

CHARARA and Dr. ZUCKER having known that the MUA receivables LLPP was hired to collect were probably uncollectible since they were generated by GLADIOLUS' illegal patient-brokering, fee-splitting, and kickback scheme.

Q. LLPP's Counterclaim Against Gladiolus

127.  On or about October 29, 2015, in response to the state court action by GLADIOLUS, LLPP submitted a proposed Counterclaim, including counterclaims for Breach of Contract, Breach of Contract Implied in Fact, and Unjust Enrichment. (LAMPF was not a counterclaim plaintiff at that time, and not until several years later.)

128.  LLPP filed the compulsory Counterclaim on November 6, 2015, for over $1,071,766.81 in unpaid attorney's fees from representing GLADIOLUS in the Federal Actions regarding MUAs for over four years, and for unjust enrichment since the lawsuit conferred a benefit on GLADIOLUS estimated to be greater than $4 million in terms of the offsetting that was stopped.

129.  Due to GLADIOLUS' failure to pay for those valuable legal services, and due to the impact of GLADIOLUS' State Case against LLPP and LAMPF, including the threat of punitive damages, the LLPP firm was forced to cease operations at the end of 2015.

130.  LAMPF incurred significant financial losses and expenses to dissolve the firm. Thus, through a subsequent dissolution agreement, LAMPF was assigned the remaining 25% of LLPP's potential recovery against GLADIOLUS in the Florida State Case.

R. GLADIOLUS' Production of the Damaging MWE Opinion

131.  On or about September 8, 2015, LLPP's counsel requested from GLADIOLUS all relevant non-privileged documents concerning LLPP and LAMPF. The Raskins' counsel made similar requests on October 29, 2015.

132.  On January 29, 2016, GLADIOLUS' counsel, TRAZENFELD, delivered to LLPP

a batch of documents—including the MWE Opinion from July 11, 2007, which had warned GLADIOLUS that the proposed business arrangements with Expert Billing would violate Florida law as a patient-brokering, fee-splitting, and kickback scheme. This was the first time LLPP and LAMPF ever became aware of the MWE Opinion.

133.  TRAZENFELD also produced the Sawran firm's timesheets and invoices with minimal redactions. TRAZENFELD acknowledged later that he had not reviewed them before turning them over. GLADIOLUS' withdrawal of that claim was notable in view of the fact that several entries in the timesheets confirmed that GLADIOLUS knew about the 2010 Federal Collection Actions at or around the time that the suits were filed.

134.  The Sawran firm's documents, which GLADIOLUS sought to have protected from LLPP, also exposed collusion and the concealment of illegal actions by GLADIOLUS, Dr. CHARARA, and Dr. ZUCKER.

135.  The timesheets detailed interactions with the MWE Opinion on July 14, 2014, and the actions that GLADIOLUS and its counsel took over the next few months to conceal the MWE Opinion—including sending two attorneys to meet with GLADIOLUS' management on July 18, 2014.

136.  The timesheets also documented the Sawran firm's research into Fifth Amendment privilege issues the day before, and the day after, their July 2014 meeting with GLADIOLUS' management. The timesheets also showed that, after the meeting, the Sawran firm analyzed its ability to defend GLADIOLUS in view of Fifth Amendment considerations, since the MWE Opinion had warned of the illegality of kickbacks, fee-splitting, and patient brokering.

137.  On July 22, 2014, SAWRAN obtained a legal opinion he had requested from the Liva's counsel, Bruce Reinhart, Esquire (before he became a U.S. Magistrate Judge) indicating that if it were determined that GLADIOLUS had paid kickbacks to the chiropractors, the

insurance carriers could sue GLADIOLUS to recover the moneys paid on the MUAs.

### S. GLADIOLUS' Withdrawal of Claims for SAWRAN's Fees

138.  One of GLADIOLUS' claims against LLPP and the Raskins was for the approximately $300,000 GLADIOLUS had paid to SAWRAN and the Sawran firm as local counsel in the Federal Collection Actions for about 6 months from about May 14, 2014 through about the end of November 2014, including for defense against UHC's counterclaim.

139.  During a March 8, 2016 deposition, when asked about the Sawran firm's bills, TRAZENFELD instructed Dr. CHARARA not to answer. In spite of Dr. CHARARA's confirming that GLADIOLUS was seeking recovery of the fees paid to the Sawran firm, TRAZENFELD refused to withdraw his objection to further inquiries about the time entries.

140.  On March 15, 2016, GLADIOLUS' administrator, Ms. Ambrose, was deposed, focusing on the MWE Opinion, for which GLADIOLUS had paid $5,000 to the MWE firm, which was addressed to her and Dr. ZUCKER. TRAZENFELD claimed inadvertent production and privilege, and instructed Ambrose not to discuss the Opinion.

141.  On March 22, 2016, when Dr. CHARARA was questioned about the MWE Opinion, TRAZENFELD claimed it was inadvertently produced and sought its return. LLPP's lawyer suggested bringing this issue to the court's attention along with other discovery disputes.

142.  The next day, GLADIOLUS suddenly withdrew its claim for the approximately $300,000 of legal fees and approximately $7,000 of costs that GLADIOLUS had paid SAWRAN and the Sawran firm. GLADIOLUS' withdrawal of that claim was notable in view of the fact that several entries within the Sawran firm's timesheets confirmed that GLADIOLUS knew about the 2010 Federal Collection Actions at or around the time that the suits were filed.

### T. Denial of GLADIOLUS' Motion for Return of the Incriminating MWE Opinion

143.  On April 1, 2016, GLADIOLUS filed a motion to compel return of the MWE

Opinion. A week later, attorney C. Berk Edwards informed LLPP's and LAMPF's defense counsel that Dr. CHARARA had dismissed TRAZENFELD for recklessly turning over the highly-damaging MWE Opinion and the SAWRAN billing records. Edwards said he would now represent Dr. CHARARA, Dr. ZUCKER, and other doctor-members of GLADIOLUS.

144.  On April 21, 2016, during a hearing before Judge Gillen, TRAZENFELD admitted he had possessed the documents for over five weeks and did not review them prior to production.

145.  On May 3, 2016, the trial court entered an order denying GLADIOLUS' motion to compel LLPP to return the MWE Opinion to GLADIOLUS.

## U. GLADIOLUS' Proposal of a Walk-Away

146.  On May 12, 2016, GLADIOLUS proposed a settlement where it would dismiss its claims against LLPP and LAMPF in exchange for an agreement that LLPP would not bring a malicious prosecution action and would dismiss its Counterclaim (which had been filed on October 29, 2015, seeking about $1.1 million in legal fees from GLADIOLUS).

147.  On May 19, 2016, LLPP's counsel informed Mr. Edwards that the walk-away proposal was rejected, and the letter addressed "the fraud, collusion, conspiracy, complicity[ ] of GLADIOLUS' management and counsel, and malicious prosecution."

## V. GLADIOLUS' Amended Complaint

148.  On August 14, 2017, GLADIOLUS, managing member SCA, directed its attorney TRAZENFELD to file its First Amended Complaint (the only amendment filed).

149.  Count I of the First Amended Complaint in the State Case alleged "NEGLIGENCE AGAINST THE LAMPF FIRM AND LAMPF."

150.  Count II of the First Amended Complaint in the State Case alleged "GROSS NEGLIGENCE AGAINST STEPHEN LAMPF."

151.  Count III of the First Amended Complaint in the State Case alleged "GROSS

NEGLIGENCE AGAINST THE LAMPF FIRM."

W.  Spurious Allegations in GLADIOLUS' Amended Complaint

152.  The First Amended Complaint contained several allegations which TRAZENFELD and GLADIOLUS, and managing member SCA, knew or clearly should have known to be false.

153.  Some of the specific false allegations stated in GLADIOLUS' First Amended Complaint included those noted in the following 17 paragraphs (¶ 154–170 ([a]-[q])).

154.  [a] Paragraph 15 misleadingly asserted that "On or about July 15, 2010, Carol Liva hired the Defendants to represent *Gladiolus Surgery, not the Plaintiff here*." (In reality, the name in the engagement letter had an obvious scrivener's error and was clearly intended to refer to GLADIOLUS SURGERY CENTER, L.L.C.)

155.  [b] Paragraph 16 falsely claimed that "Gladiolus did not authorize Carol Liva to employ the Defendants as Gladiolus' attorneys."

156.  [c] Paragraph 18 spuriously asserted, "There is no document that authorizes Carol Liva to enter into agreements on behalf of Gladiolus."

157.  [d] Paragraph 20 speciously claimed that LLPP and LAMPF "made no efforts to contact Dr. Charara … at the time critical events occurred in the UHC Lawsuit."

158.  [e] Paragraph 21 falsely alleged that LLPP and LAMPF "knew that the Lampf Firm did not have an attorney-client relationship with Gladiolus when they caused the UHC Lawsuit to be filed."

159.  [f] Paragraph 31 misleadingly asserted that LLPP and LAMPF "proceeded to litigate the UHC Lawsuit *without any communication* with Gladiolus until October 8, 2013."

160.  [g] Paragraph 37 spuriously claimed that "Gladiolus … settled the UHC Lawsuit … which *it never authorized*."

161.  [h] Paragraph 37 misleadingly alleged, "During the UHC Lawsuit, the Defendants

failed to advise Gladiolus of significant events."

162. [i] Paragraph 37 speciously alleged that LLPP and LAMPF "fail[ed] to obtain Gladiolus' authority to file and/or proceed with the UHC Lawsuit…."

163. [j] Paragraph 38 falsely claimed that if LLPP and LAMPF "had communicated with Gladiolus regarding the UHC lawsuit, Gladiolus *would not have authorized* the UHC lawsuit to be filed or pursued."

164. [k] Paragraph 39 spuriously asserted that the Action Against UHC was filed "without the knowledge or authorization of Gladiolus…."

165. [l] Paragraph 43 speciously alleged that LAMPF "fail[ed] to obtain Gladiolus' authority to file and/or proceed with the UHC Lawsuit…."

166. [m] Paragraph 44 falsely claimed that if LAMPF "had communicated with Gladiolus regarding the UHC lawsuit, Gladiolus would not have authorized the UHC lawsuit to be filed or pursued."

167. [n] Paragraph 46 spuriously asserted that LAMPF filed and pursued the Lawsuit "without the knowledge or authorization of Gladiolus."

168. [o] Paragraph 50 falsely alleged that LLPP "fail[ed] to obtain Gladiolus' authority to file and/or proceed with the UHC Lawsuit…."

169. [p] Paragraph 51 speciously claimed that if LLPP "had communicated with Gladiolus regarding the UHC lawsuit, Gladiolus would not have authorized the UHC lawsuit to be filed or pursued."

170. [q] Paragraph 54 spuriously asserted that LLPP filed and pursued the Action Against UHC "without the knowledge or authorization of Gladiolus."

171. GLADIOLUS, TRAZENFELD, and managing member SCA knew those allegations were false, rending GLADIOLUS' lawsuit baseless at the time when TRAZENFELD

filed the First Amended Counterclaim on behalf of GLADIOLUS and at the insistence of SCA.

Yet, GLADIOLUS, SCA, and TRAZENFELD proceeded anyway out of malice.

## X. Preliminary Order as to Return of the MWE Opinion

172.  After extensive litigation on GLADIOLUS' quest for return of the MWE Opinion,

Judge Gillen entered an order on April 25, 2018, finding that LLPP and LAMPF had proven:

> "… a prima facie case that Gladiolus Surgery Center, Dr. Ira Zucker, Dr. Husni Charara and Gladiolus Surgery Center Administrator Lorraine Ambrose, acting in concert, violated Florida Statutes §456.054, Kickbacks Prohibited; §817.505, Patient Brokering Prohibited; [and other laws]..., by committing crimes or fraud with regard to the Manipulations Under Anesthesia performed at Gladiolus Surgery Center between 2007 and 2009, by agreeing to pay the "Liva Entities" … fifty percent (50%) of all income derived from the MUA procedures, performed on patients who were referred to Gladiolus Surgery Center by chiropractors and physicians under the Liva's control or direction."

173.  The ruling "denie[d] without prejudice the assertion that the crime fraud exception

applies as to the McIntosh, Sawran records other than their time records," even though

GLADIOLUS had dropped its claim for fees and costs paid to SAWRAN.

## Y. Final Order on the Crime/Fraud Exception

174.  On November 30, 2018, Judge Gillen's final order conclusively overruled

Gladiolus' privilege claim.  It found that the crime-fraud exception applied because

GLADIOLUS' intent was to use the MWE Opinion's information for unlawful purposes, and

found that GLADIOLUS and its doctor-owners intended to enter the agreements with the Liva

Entities (which the court found to be unlawful), despite knowing such arrangements were illegal

as advised in the MWE Opinion.

## Z. Gladiolus' Reaction to the Crime/Fraud Order

175.  On December 10, 2018, ten days after entry of Judge Gillen's final order,

GLADIOLUS proposed a settlement to LLPP and LAMPF's malpractice insurer, offering to

drop the First Amended Complaint without requiring LLPP and LAMPF to dismiss their

Counterclaim. However, TRAZENFELD said GLADIOLUS would maintain its position that it knew nothing of the lawsuits until October 17, 2013, and it would contest LLPP's Counterclaim.

176.  The insurance carrier's attorney at the Lydecker firm informed TRAZENFELD that the carrier was going to bring a lawsuit against GLADIOLUS and TRAZENFELD to recover the substantial legal fees that the carrier had paid to a law firm for defense of LLPP and LAMPF. The carrier's counsel at the prestigious Lydecker firm said the suit would be based on GLADIOLUS' and TRAZENFELD's outrageous, egregious, bad faith, intentional misconduct pursuant to the Florida Supreme Court's *Moakley v. Smallwood* decision.

177.  LLPP and LAMPF directed the carrier to reject GLADIOLUS' December 10, 2018 proposal because GLADIOLUS made the proposal contingent on both LLPP and LAMPF agreeing that they would not bring a claim for malicious prosecution and/or punitive damages.

178.  On May 16, 2019, TRAZENFELD again e-mailed the attorney for LLPP's and LAMPF's insurance carrier. TRAZENFELD, on behalf of himself and GLADIOLUS, agreed not to contest the carrier's filing of a lawsuit for bad faith intentional misconduct, provided that the claim would be limited to $75,000, which was the deductible that had been paid to the carrier. The carrier and LLPP and LAMPF rejected this proposal.

179.  When GLADIOLUS again offered to dismiss its First Amended Complaint against LLPP and LAMPF, LLPP and LAMPF had to inform their malpractice carrier, Ironshore Insurance Services ("Ironshore"), of that offer. Thus, in June 2019, LLPP and LAMPF entered into an agreement whereby Ironshore would no longer be obligated to represent LLPP and LAMPF in their defense against GLADIOLUS' lawsuit.

180.  LLPP and LAMPF had to retain and pay substantial amounts of attorney's fees to a law firm, Shendell & Pollock, P.L. for further defense; and they remain obligated for additional significant sums to counsel for attorney fees for which a lien was filed by former counsel. In

return, Ironshore assigned to LLPP and LAMPF Ironshore's counterclaim for attorney's fees against GLADIOLUS and TRAZENFELD.

## AA. **Dismissal of GLADIOLUS' Complaint**

181.  On September 18, 2022, GLADIOLUS filed Plaintiff's Notice of Voluntary Dismissal Without Prejudice, which dismissed its Complaint against LLPP and LAMPF.

182.  Thus, after putting LLPP and LAMPF through more than seven years of meritless litigation, GLADIOLUS' Complaint was terminated in favor of LLPP and LAMPF.

183.  GLADIOLUS filed the voluntary dismissal of its claims because there was not a factual basis to support the claims and because GLADIOLUS did not have probable cause or an evidentiary basis to support the allegations, and did not want to have a jury trial on its claims.

184.  This Court has recognized that "[t]here are instances … where a voluntary dismissal [without prejudice] constitutes a favorable bona fide termination, depending on the circumstances under which the withdrawal occurs...." *Johnson Law Group v. Elimadebt USA, LLC*, 09-CV-81331, 2010 WL 2035284, at *6 (S.D. Fla. May 24, 2010) (citations omitted; brackets and emphasis added). Where a malicious-prosecution complaint alleges that the original plaintiff in the original action took a voluntary dismissal because there was not a factual basis to support the claims and/or because he did not have probable cause or an evidentiary basis to support the allegations, then there was a bona fide termination of the underlying claims in favor of the current Plaintiff. *Union Oil of California Amsco Div. v. Watson*, 468 So. 2d 349, 353 (Fla. 3d DCA 1985).

## BB. Absence of Probable Cause for GLADIOLUS' State Case

185.  When GLADIOLUS initiated the State Case by filing the Complaint in 2015, Dr. CHARARA and Dr. ZUCKER and SAWRAN and TRAZENFELD knew or clearly should have known that the overall premise and substantive allegations within it were false.

186.  They knew that Dr. CHARARA and Dr. ZUCKER were fully aware of the 2010 Federal Collection Actions and Dr. CHARARA had authorized and/or consented to LLPP's and LAMPF's bringing those Actions before they were filed or, at the very least, within about seven weeks after the Action Against UHC was filed.

187.  GLADIOLUS knew or clearly should have known that many allegations in the Complaint, including the non-exhaustive list of specific examples listed at paragraphs 116-125 herein, were false and unfounded.

188.  GLADIOLUS knew or clearly should have known that many allegations in the First Amended Complaint, including the non-exhaustive list of specific examples of falsehoods and unfounded allegations listed at paragraphs 154-170 herein, were false and unfounded

189.  GLADIOLUS, Dr. CHARARA, Dr. ZUCKER, SAWRAN, and TRAZENFELD could not have had any reasonable belief in the merits of its claims in the State Case because GLADIOLUS knew that it lacked supporting evidence, and knew that the claims were false and contrary to the actual facts.

190.  GLADIOLUS had vengeful motives for suing LLPP and LAMPF; GLADIOLUS and its principals were annoyed about having to settle with UHC for $1.8 million, and GLADIOLUS spitefully took out its annoyance on LLPP and LAMPF. The State Case was also a baseless scheme to recoup, from the innocent LLPP and LAMPF, the funds that GLADIOLUS had paid out in its settlement with UHC and the fees and costs it had paid to SAWRAN.

191.  Further, Dr. CHARARA and Dr. ZUCKER knew that GLADIOLUS' business arrangements with the Liva Entities were unlawful and still caused GLADIOLUS to enter into those unlawful contracts in spite of having the MWE Opinion that warned of the illegality.

192.  Moreover, Dr. CHARARA and Dr. ZUCKER, on behalf of GLADIOLUS, knew that the receivables they wanted Expert Billing to have LLPP and LAMPF pursue, were likely

uncollectible because they were accrued by unlawful means as warned in the MWE Opinion.

CC. <u>Defendants Inflicted Severe Damages Upon LLPP and LAMPF</u>.

193.  By the time GLADIOLUS finally dismissed its unfounded Complaint, LLPP and LAMPF had suffered extensive damage as a direct and proximate result of the baseless litigation instituted by GLADIOLUS and TRAZENFELD in the State Case at the direction of, and instigated by, Dr. CHARARA and Dr. ZUCKER, and continued by SCA, and spurred (and, on information and belief, assisted) by SAWRAN.

194.  Examples of the damages suffered by Plaintiffs include, but are not limited to the examples in the following five paragraphs (¶ 195-199 ([a]-[e])):

195.  [a] Plaintiffs incurred great amounts of legal fees and expenses in LLPP and LAMPF's having to defend against the unfounded State Case for approximately seven (7) years and eight (8) months, defending against a suit that all Defendants knew to be baseless.

196.  [b] Plaintiffs suffered emotional distress and mental anguish due to the stress of having to defend against the meritless, egregious, outrageous, prolonged action in the State Case.

197.  [c] Plaintiffs suffered the forced demise of the LLPP law firm and substantial loss of income, profits, and business opportunities stemming from that dissolution as well as the stigma associated with GLADIOLUS' wrongful legal action.

198.  [d] Plaintiffs suffered irreparable harm to LLPP's and LAMPF's reputations and standing in the legal community as a result of the false accusations instigated by GLADIOLUS.

199.  [e] Plaintiffs suffered damage regarding attorney's fees assigned from Ironshore as a result of Defendant's failure to unconditionally dismiss the State Case without insisting on caps on the value of counterclaims, such that Ironshore could no longer represent LLPP and LAMPF and in exchange assigned its entitlement to legal fees.

200.  Plaintiffs should be fully compensated for all of those damages and any others to be

determined at trial. The Florida Supreme Court held in *Debrincat v. Fischer*, 217 So. 3d 68, 70-71 (Fla. 2017), that the litigation privilege does not shield a litigant (or their attorney) from a claim for malicious prosecution. All Defendants are liable for the damages.

## COUNT I: MALICIOUS PROSECUTION
### (Plaintiffs against **GLADIOLUS SURGERY CENTER, L.L.C.**)

201.  Plaintiffs incorporate, adopt, repeat, and reallege paragraphs 1-200 as if fully stated herein in this Count against GLADIOLUS SURGERY CENTER, L.L.C. ("**GLADIOLUS**").

**A.** *A civil judicial proceeding was previously commenced or continued against the present Plaintiffs.*

202.  On or about January 30, 2015, GLADIOLUS filed the State Case against LLPP and LAMPF.

203.  On or about August 14, 2017, GLADIOLUS, by and through managing member SCA, maintained and continued the State Case against LLPP and LAMPF by having TRAZENFELD prepare and file the First Amended Complaint, which was maintained until September 18, 2022.

**B.** *The present Defendant was the legal cause of the original proceeding against the present Plaintiffs as defendants in the State Case;  i.e., the proceeding was instigated by the present Defendant.*

204.  Shortly after GLADIOLUS' November 2014 settlement with UHC, Defendant GLADIOLUS, through SAWRAN, Dr. CHARARA, Dr. ZUCKER, and TRAZENFELD, devised a scheme to recover the settlement money paid to UHC and fees paid to SAWRAN, despite knowing that the scheme was meritless.

205.  GLADIOLUS filed the State Case as the plaintiff and actively pursued the claims against LLPP and LAMPF in the Complaint and in the First Amended Complaint.

206.  In legal causation of the original proceeding, GLADIOLUS both commenced and

continued the litigation against LLPP and LAMPF in the State Case.

C. *The termination of the State Case constituted a bona fide termination of that proceeding in favor of the present Plaintiffs; i.e., the proceeding was ended in favor of the present Plaintiffs.*

207.  As noted in paragraphs 181-184, *supra*, GLADIOLUS took the voluntary dismissal of its claims on September 18, 2022, because there was not a factual basis to support the claims and because GLADIOLUS did not have probable cause or an evidentiary basis to support the allegations. Accordingly, the State Case concluded in a termination that was bona fide and was in favor of LLPP and LAMPF; and the statute of limitations to re-file the suit or bring a new suit has long expired.

D. *There was an absence of probable cause to file or maintain the original proceeding.*

208.  As shown in the General Allegations, when GLADIOLUS initiated the State Case, GLADIOLUS and its management and counsel knew that the overall premise of the Complaint was false because GLADIOLUS, through its managing members and through its agent/partner Expert Billing, had expressed a desire for LLPP to sue the insurance carriers and they knew that LLPP and LAMPF had done so pursuant to the engagement by Carol Liva and/or Expert Billing as an agent of GLADIOLUS.

209.  GLADIOLUS could not have had any reasonable belief in the merits of its claims in the State Case because GLADIOLUS knew that it lacked supporting evidence, and knew that the claims were false and contrary to the actual facts.

E. *There was actual or legal malice on the part of the present Defendant in instigating, filing, or continuing the prior proceeding.*

210.  Throughout the instigation, initiation, maintenance, and continuation of the State Case, GLADIOLUS demonstrated malice towards Plaintiffs.

211.  Actual Malice: GLADIOLUS exhibited a vengeful intent to destroy LLPP and

LAMPF because GLADIOLUS was annoyed about having to settle with UHC for $1.8 million, and GLADIOLUS took out its annoyance on LLPP and LAMPF and initiated the State Case. Thus, GLADIOLUS exhibited actual malice towards LLPP and LAMPF.

212.   Legal Malice: GLADIOLUS showed a reckless disregard for truth and LLPP's and LAMPF's rights, advancing baseless, unsubstantiated claims and ignoring facts opposing its stance in the State Case. GLADIOLUS initiated and continued the litigation in spite of knowing that the basic premise of, and many specific allegations in, the Complaint and Amended Complaint were meritless, demonstrating a lack of probable cause and showing legal malice.

**F.**  *The present Plaintiffs suffered damage as a result of the original proceeding.*

213.   As a direct and proximate result of GLADIOLUS' pursuit of the unfounded State Case, Plaintiffs incurred substantial damages.

### i. *Compensatory Damages*

214.   Plaintiffs suffered extensive, compensable harm, including but not limited to the examples listed in paragraphs 193-200, *supra*.

215.   Plaintiffs should be fully compensated for all of those damages and any others to be determined at trial.

### ii. *Punitive Damages*

216.   GLADIOLUS knowingly initiated and pursued the meritless State Case against LLPP and LAMPF, demonstrating clear intent to harm, and willfully continued it in bad faith for over seven years. GLADIOLUS' litigation was malicious, willful, and grossly reckless, with a specific intent to harm Plaintiffs, and resulted in severe actual harm.

217.   This conduct, motivated by a personal vendetta against LLPP and LAMPF, exhibits both actual malice and legal malice, arising from a lack of probable cause or intentional misconduct and/or gross negligence, indicating a wanton and reckless disregard for Plaintiffs'

rights while aware of the likelihood of harm.

218.  GLADIOLUS' intentional, willful disregard for Plaintiffs' rights constitutes a public wrong. GLADIOLUS' egregious actions involving intentional misconduct or gross negligence merit punitive damages to penalize Defendant for the severe and irreparable harm inflicted and/or to deter future conduct.

219.  As a limited liability company, GLADIOLUS is liable for punitive damages due to its agents' conduct under § 768.72(2), Fla. Stat., either through active participation in, or approval of, the egregious conduct, or for gross negligence contributing to the Plaintiffs' losses.

220.  WHEREFORE, Plaintiffs, STEPHEN LAMPF and LAMPF, LIPKIND, PRUPIS & PETIGROW, P.A., seek judgment for Malicious Prosecution in this action against **GLADIOLUS SURGERY CENTER, L.L.C.**, for compensatory damages in an amount to be determined at trial (but far more than $75,000 exclusive of pre-judgment interest, costs and attorneys' fees), along with punitive damages in an amount to be determined by the jury but not less than six million dollars ($6,000,000.00) (for which Defendant GLADIOLUS should be jointly and severally liable with the other Defendants herein), and Plaintiffs also request prejudgment and post-judgment interest at the highest rate allowable by law, along with attorney's fees, costs, and any and all other relief that this Honorable Court deems just, equitable, and proper.

## COUNT II: MALICIOUS PROSECUTION
(Plaintiffs against **SURGICAL CARE AFFILIATES, INC.** a/k/a SCA HEALTH)

221.  Plaintiffs incorporate, adopt, repeat, and reallege paragraphs 1-200 as if fully stated herein, in this claim against SURGICAL CARE AFFILIATES, INC. a/k/a SCA Health ("**SCA**").

**A.** *A civil judicial proceeding was previously commenced or continued against the present Plaintiffs.*

222. When SCA became the 50% controlling owner and managing member of GLADIOLUS starting in April 2016 and at all relevant times while it maintained that role, SCA knowingly maintained and continued GLADIOLUS' underlying State Case against LLPP and LAMPF via having GLADIOLUS maintain the original Complaint despite knowing of its lack of merit, demonstrating a clear intent to harm LLPP and LAMPF.

223. On or about August 14, 2017, SCA maintained and continued the State Case against LLPP and LAMPF by deciding that GLADIOLUS would file its First Amended Complaint and add a claim for punitive damages.

> **B.** *The present Defendant was the legal cause of the original proceeding against the present Plaintiffs as defendants in the State Case;  i.e., the proceeding was instigated or continued by the present Defendant.*

224.  SCA, as a 50% controlling owner and managing member of GLADIOLUS starting in April 2016, knowingly maintained and pursued the underlying State Case against LLPP and LAMPF on the original Complaint despite knowing of its lack of merit, demonstrating a clear intent to harm LLPP and LAMPF, and continued and maintained the State Case in August 2017 by virtue of deciding that GLADIOLUS would file its unfounded First Amended Complaint and add a baseless claim for punitive damages.

225.  In legal causation of the original proceeding, SCA led GLADIOLUS to continue its malicious and fraudulent scheme of trying to obtain damages by falsely accusing LLPP and LAMPF of professional negligence for having brought the Action Against UHC and having represented GLADIOLUS in the Action Against UHC, allegedly without GLADIOLUS' knowing or consenting to the lawsuit or the legal representation.

226.  SCA wrongfully and vindictively decided that GLADIOLUS would maintain and continue the State Case against LLPP and LAMPF and actively continue the claims against

LLPP and LAMPF in the Complaint and in the First Amended Complaint.

    **C.** *The termination of the State Case constituted a bona fide termination of that proceeding in favor of the present Plaintiffs; i.e., the proceeding was ended in favor of the present Plaintiffs.*

    227.  As noted in paragraphs 181-184, *supra*, GLADIOLUS took the voluntary dismissal of its claims on September 18, 2022, because there was not a factual basis to support the claims and because GLADIOLUS did not have probable cause or an evidentiary basis to support the allegations. Accordingly, the State Case concluded in a termination that was bona fide and was in favor of LLPP and LAMPF; and the statute of limitations to re-file the suit or bring a new suit has long expired.

    **D.** *There was an absence of probable cause to file or maintain the original proceeding.*

    228.  When SCA decided that GLADIOLUS would maintain the State Case by continuing the litigation on GLADIOLUS' Complaint, SCA knew or clearly should have known that the overall premise and substantive allegations within it were false because GLADIOLUS, through its managing members and through its agent/partner Expert Billing, had expressed a desire for LLPP to sue the insurance carriers and knew that LLPP and LAMPF had done so.

    229.  SCA could not have had any reasonable belief in the merits of its GLADIOLUS' claims in the State Case because SCA knew that it lacked supporting evidence, and knew that the claims were false and contrary to the actual facts.

    230.  SCA had vindictive, vengeful motives in its decision to have GLADIOLUS continue the State Case litigation against LLPP and LAMPF, as SCA was aware that GLADIOLUS was annoyed about having to settle with UHC for $1.8 million, and SCA decided that GLADIOLUS would spitefully continue to take out its annoyance on LLPP and LAMPF.

    231.  SCA knew or clearly should have known that the State Case was a baseless and

malicious attempt to recoup, from the innocent LLPP and LAMPF, the funds that GLADIOLUS had paid out in its settlement with UHC.

232.   Upon information and belief, SCA also knew that Dr. CHARARA and Dr. ZUCKER had wanted Expert Billing to have LLPP and LAMPF, on behalf of GLADIOLUS, pursue collection of receivables that Dr. CHARARA and Dr. ZUCKER knew were probably uncollectible because they were accrued by unlawful means. That knowledge contributed to the wrongfulness of the State Case that SCA decided GLADIOLUS would continue to litigate against LLPP and LAMPF.

**E.**   *There was actual or legal malice on the part of the present Defendant in instigating, filing, or continuing the prior proceeding.*

233.   Throughout the maintenance and continuation of the State Case by GLADIOLUS, SCA demonstrated malice towards Plaintiffs, which is evident in:

234.   Actual Malice: SCA exhibited a hateful intent in deciding that GLADIOLUS would continue trying to destroy LLPP and LAMPF because GLADIOLUS was annoyed about having to settle with UHC for $1.8 million, and SCA decided that GLADIOLUS would continue to take out its annoyance on LLPP and LAMPF by continuing the State Case. Thus, SCA exhibited actual malice towards LLPP and LAMPF.

235.   Legal Malice: SCA displayed a reckless disregard for the truth and for LLPP's and LAMPF's rights by deciding that GLADIOLUS would maintain and continue claims that it knew or should have known to be baseless and unsubstantiated, and ignoring the actual facts which were contrary to its position, in the State Case.

236.   Upon information and belief, at all relevant times SCA knew that GLADIOLUS was aware of the 2010 Federal Collection Actions and had requested that LLPP pursue such actions as stated in detail in the General Allegations that are incorporated by reference herein.

Thus at all relevant times, SCA knew or clearly should have known that the basic premise for GLADIOLUS' State Case was false.

237.  At all relevant times, SCA knew or should have known that there was a lack of probable cause for GLADIOLUS to maintain and continue the State Case and to add an unfounded claim for punitive damages against LLPP and LAMPF, and SCA thereby exhibited legal malice toward LLPP and LAMPF.

**F.** *The present Plaintiffs suffered damage as a result of the original proceeding.*

238.  As a direct and proximate result of the unfounded State Case, Plaintiffs incurred substantial and serious damage.

*i. Compensatory Damages*

239.  Plaintiffs suffered extensive, compensable harm, including but not limited to the examples listed in paragraphs 193-200, *supra*.

*ii. Punitive Damages*

240.  SCA, through GLADIOLUS, knowingly maintained and continued the meritless State Case against LLPP and LAMPF, demonstrating clear intent to harm, and willfully continued it in bad faith for over seven years. The litigation was malicious, willful, and grossly reckless, with a specific intent to harm Plaintiffs, and resulted in severe actual harm.

241.  This conduct, motivated by a personal vendetta against LLPP and LAMPF, exhibits both actual malice and legal malice, arising from a lack of probable cause or intentional misconduct and/or gross negligence, indicating a wanton and reckless disregard for Plaintiffs' rights while aware of the likelihood of harm.

242.  SCA's intentional, willful disregard for Plaintiffs' rights constitutes a public wrong. SCA's egregious actions involving intentional misconduct or gross negligence merit punitive damages to penalize Defendant for the severe and irreparable harm inflicted and/or to deter

future conduct.

243.  As a corporation, SCA is subject to punitive damages because of the conduct of its agents or employees which meets the criteria specified in § 768.72(2) and SCA actively and knowingly participated in the egregious conduct and/or knowingly condoned or ratified or consented to their conduct; or SCA engaged in conduct that constituted gross negligence and that contributed to the loss, damages, or injury suffered by LLPP and LAMPF. § 768.72(3), Fla. Stat.

244.  WHEREFORE, Plaintiffs, STEPHEN LAMPF and LAMPF, LIPKIND, PRUPIS & PETIGROW, P.A., seek judgment for Malicious Prosecution in this action against **SURGICAL CARE AFFILIATES, INC.**, a/k/a SCA Health, for damages in an amount to be determined at trial (but far more than $75,000 exclusive of pre-judgment interest, costs and attorneys' fees), along with punitive damages in an amount to be determined by the jury but not less than ten million dollars ($10,000,000.00) (for which Defendant SCA should be jointly and severally liable with the other Defendants herein), and Plaintiffs also request prejudgment and post-judgment interest at the highest rate allowable by law, along with attorney's fees, costs, and any and all other relief that this Honorable Court deems just, equitable, and proper.

## COUNT III: MALICIOUS PROSECUTION
### (Plaintiffs against **HUSNI A. CHARARA and IRA A. ZUCKER**)

245.  Plaintiffs incorporate, adopt, repeat, and reallege paragraphs 1-200 as if fully stated herein in this Count against Dr. HUSNI A. CHARARA ("Dr. **CHARARA**") and Dr. IRA A. ZUCKER ("Dr. **ZUCKER**").

    **A.**  *A civil judicial proceeding was previously commenced or continued against the present Plaintiffs.*

246.  On January 30, 2015, Dr. CHARARA and Dr. ZUCKER, as managing members of

GLADIOLUS SURGERY CENTER, L.L.C., caused GLADIOLUS to file the State Case described in the General Allegations.

**B.** *The present Defendant was the legal cause of the original proceeding against the present Plaintiffs as defendants in the State Case; i.e., the proceeding was instigated by the present Defendant.*

247. In legal causation of the original proceeding, Dr. CHARARA and Dr. ZUCKER instigated the State Case by causing GLADIOLUS to file it against LLPP and LAMPF in January 2015, about two months after GLADIOLUS' settlement with UHC in November 2014.

248. Dr. CHARARA and Dr. ZUCKER were annoyed about GLADIOLUS paying out $1.8 million in a settlement with UHC and thus Dr. CHARARA and Dr. ZUCKER devised an outrageous, malicious scheme to have GLADIOLUS attempt to recover the money it had paid to UHC even though Dr. CHARARA and Dr. ZUCKER knew that there was no merit to the vengeful scheme.

249. GLADIOLUS' scheme instigated by Dr. CHARARA and Dr. ZUCKER, and spurred by SAWRAN and promoted by TRAZENFELD and perpetuated by SCA, was to try to obtain money by falsely accusing LLPP and LAMPF of professional negligence for having brought the Action Against UHC and having represented GLADIOLUS in the Action Against UHC, allegedly without GLADIOLUS' knowing or consenting to the lawsuit or the legal representation.

250. However, Dr. CHARARA and Dr. ZUCKER prompted GLADIOLUS' filing of the State Case as the plaintiff and caused GLADIOLUS to actively pursue the claims against LLPP and LAMPF. Thus, Dr. CHARARA and Dr. ZUCKER instigated and caused the commencement and maintenance of GLADIOLUS' litigation in the State Case.

**C.** *The termination of the State Case constituted a bona fide termination of that proceeding in favor of the present Plaintiffs; i.e., the proceeding was ended in favor of the present Plaintiffs.*

251.  As noted in paragraphs 181-184, *supra*, GLADIOLUS took the voluntary dismissal of its claims on September 18, 2022, because there was not a factual basis to support the claims and because GLADIOLUS did not have probable cause or an evidentiary basis to support the allegations. Accordingly, the State Case concluded in a termination that was bona fide and was in favor of LLPP and LAMPF; and the statute of limitations to re-file the suit or bring a new suit has long expired.

> **D.** *There was an absence of probable cause to file or maintain the original proceeding.*

252.  As shown in the General Allegations, when Dr. CHARARA and Dr. ZUCKER caused GLADIOLUS to initiate the State Case by filing the Complaint, GLADIOLUS and its management and counsel knew or clearly should have known that the overall premise and substantive allegations within it were false because GLADIOLUS, through its managing members and through its agent/partner Expert Billing, had expressed a desire for LLPP to sue the insurance carriers and knew that LLPP and LAMPF had done so pursuant to the engagement by Carol Liva and/or Expert Billing as an agent of GLADIOLUS.

253.  Dr. CHARARA and Dr. ZUCKER could not have had any reasonable belief in the merits of GLADIOLUS' claims in the State Case because Dr. they knew that it lacked supporting evidence, and knew that the claims were false and contrary to the actual facts.

> **E.** *There was actual or legal malice on the part of the present Defendants in instigating, filing, or continuing the prior proceeding.*

254.  Throughout the initiation and maintenance of the State Case, Dr. CHARARA and Dr. ZUCKER demonstrated malice towards Plaintiffs, which is evident in:

255.  <u>Actual Malice</u>: Dr. CHARARA and Dr. ZUCKER exhibited an intent to harm LLPP and LAMPF because Dr. CHARARA and Dr. ZUCKER were annoyed about

GLADIOLUS having to settle with UHC for $1.8 million, and Dr. CHARARA and Dr. ZUCKER took out their annoyance on LLPP and LAMPF and initiated the State Case, out of spite, animosity, and a desire for harm. Thus, Dr. CHARARA and Dr. ZUCKER exhibited actual malice towards LLPP and LAMPF.

256.  <u>Legal Malice</u>: Dr. CHARARA and Dr. ZUCKER displayed disregard for LLPP's and LAMPF's rights by causing GLADIOLUS to pursue claims that they knew or should have known to be baseless and unsubstantiated, and ignoring the actual facts which were contrary to GLADIOLUS' position, in the State Case.

257.  Dr. CHARARA and Dr. ZUCKER knew about the 2010 Federal Collection Actions and one of both of these Defendants had requested that LLPP and LAMPF pursue such actions on behalf of GLADIOLUS as stated in the General Allegations. Dr. CHARARA and Dr. ZUCKER knew that the basic premise for the State Case was false.

258.  Thus, Dr. CHARARA and Dr. ZUCKER knew that there was a lack of probable cause for the State Case and thereby exhibited legal malice toward LLPP and LAMPF.

**F.**  *The present Plaintiffs suffered damage as a result of the original proceeding.*

259.  While, in general, officers, directors, and employees may not usually be personally liable for acts or failures to act regarding corporate (or, in this case, LLC) management or policy, it does not follow that the officer or individual is shielded from accountability for tortious conduct that he himself instigated. "In this circumstance, it is not necessary that the corporate 'veil' be pierced or even discussed." *Buckner v. Luther Campbell*, 09-22815-CIV, 2010 WL 5058314, at *2 (S.D. Fla. Dec. 6, 2010) (citation and internal quotes omitted). Under Florida law, such person who commits or participates in a tort, like herein, will be liable to third parties injured by his/her actions. *Id*. at n.2.

260.  As a direct and proximate result of the unfounded State Case, Plaintiffs incurred

substantial and serious damage.

### i. *Compensatory Damages*

261.  Plaintiffs suffered extensive, compensable harm, including but not limited to the examples listed in paragraphs 193-200, *supra*.

262.  Plaintiffs should be fully compensated for all of those damages and any others to be determined at trial.

### ii. *Punitive Damages*

263.  Dr. CHARARA and Dr. ZUCKER knowingly initiated and pursued the meritless State Case against LLPP and LAMPF, demonstrating clear intent to harm, and willfully continued it in bad faith for over seven years. The litigation was malicious, willful, and grossly reckless, with a specific intent to harm Plaintiffs, and resulted in severe actual harm.

264.  This conduct, motivated by a personal vendetta against LLPP and LAMPF, exhibits both actual malice and legal malice, arising from a lack of probable cause or intentional misconduct and/or gross negligence, indicating a wanton and reckless disregard for Plaintiffs' rights while aware of the likelihood of harm.

265.  Dr. CHARARA's and Dr. ZUCKER's intentional, willful disregard for Plaintiffs' rights constitutes a public wrong. Dr. CHARARA's and Dr. ZUCKER's egregious actions involving intentional misconduct or gross negligence merit punitive damages to penalize Defendant for the severe and irreparable harm inflicted and/or to deter future conduct.

266.  WHEREFORE, Plaintiffs, STEPHEN LAMPF and LAMPF, LIPKIND, PRUPIS & PETIGROW, P.A., seek judgment for Malicious Prosecution in this action against **HUSNI A. CHARARA** and **IRA A. ZUCKER**, for damages in an amount to be determined at trial (but far more than $75,000 exclusive of pre-judgment interest, costs and attorneys' fees), along with punitive damages in an amount to be determined by the jury but not less than six million dollars

($6,000,000.00) (for which Defendants Dr. CHARARA and Dr. ZUCKER should be jointly and severally liable along with the other Defendants), and Plaintiffs request prejudgment and post-judgment interest at the highest rate allowable by law, along with attorney's fees, costs, and any and all other relief that this Honorable Court deems just, equitable, and proper.

## COUNT IV: MALICIOUS PROSECUTION
(Plaintiffs Against **WARREN R. TRAZENFELD**)

267.  Plaintiffs incorporate, adopt, repeat, and reallege paragraphs 1-200 as if fully stated herein in this Count against WARREN R. TRAZENFELD ("**TRAZENFELD**").

**A.** *A civil judicial proceeding was previously commenced or continued against the present Plaintiffs.*

268.  On or about January 30, 2015, TRAZENFELD filed the State Case, described in the General Allegations, on behalf of GLADIOLUS and against LLPP and LAMPF.

269. On or about August 14, 2017, TRAZENFELD prepared and filed the First Amended Complaint, helping GLADIOLUS, by and through SCA, maintain and continue the State Case against LLPP and LAMPF.

**B.** *The present Defendants were the legal cause of the original proceeding against the present Plaintiffs as defendants in the State Case; i.e., the proceeding was commenced or instigated by the present Defendant.*

270.  TRAZENFELD commenced the State Case, in cooperation and in collusion with Dr. CHARARA, Dr. ZUCKER, and SAWRAN, by preparing and filing the Complaint on behalf of GLADIOLUS in the State Case against LLPP and LAMPF on January 30, 2015.

271.  TRAZENFELD encouraged or exacerbated GLADIOLUS' annoyance about its paying out $1.8 million in a settlement with UHC and thus TRAZENFELD colluded with SAWRAN and Dr. CHARARA and Dr. ZUCKER to concoct a baseless, vengeful scheme to

have GLADIOLUS attempt to recover the money it had paid to UHC even though TRAZENFELD knew that there was no merit to the scheme.

272.  In legal causation of the original proceeding, TRAZENFELD not only commenced the State Case in January 2015 and pursued it on GLADIOLUS' behalf, but also maintained and continued the State Case by filing the First Amended Complaint on GLADIOLUS' behalf in 2017. TRAZENFELD also made it clear that he, on behalf of GLADIOLUS, would be seeking punitive damages against LLPP and LAMPF. However, TRAZENFELD knew or should have known that a claim for punitive damages was utterly meritless.

**C.** *The termination of the State Case constituted a bona fide termination of that proceeding in favor of the present Plaintiffs; i.e., the proceeding was ended in favor of the present Plaintiffs.*

273.  As noted in paragraphs 181-184, *supra*, GLADIOLUS took the voluntary dismissal of its claims on September 18, 2022, because there was not a factual basis to support the claims and because GLADIOLUS did not have probable cause or an evidentiary basis to support the allegations. Accordingly, the State Case concluded in a termination that was bona fide and was in favor of LLPP and LAMPF; and the statute of limitations to re-file the suit or bring a new suit has long expired.

**D.** *There was an absence of probable cause to file or maintain the original proceeding.*

274.  When TRAZENFELD commenced the State Case on behalf of GLADIOLUS, TRAZENFELD knew or should have known that the overall premise and substantive allegations within it were false because Dr. CHARARA, on behalf of GLADIOLUS and with knowledge of Dr. ZUCKER, had asked GLADIOLUS' agent/partner Expert Billing to have LLPP sue the insurance carriers, and Dr. CHARARA and Dr. ZUCKER knew that LLPP and LAMPF had done so via an engagement by GLADIOLUS' agent, and they ratified the representation by not

objecting after receiving the *Outpatient Surgery* article which described the Action Against UHC and by Dr. CHARARA's saying that he was pleased because the 2010 Federal Actions had stopped the offsetting.

275. TRAZENFELD could not have had any reasonable belief in the merits of GLADIOLUS' claims in the State Case because TRAZENFELD and Dr. CHARARA and Dr. ZUCKER knew that they lacked supporting evidence, and knew that the claims were false and contrary to the actual facts.

276. TRAZENFELD knew from the inception of the State Case that GLADIOLUS' January 2015 Complaint and its August 2017 First Amended Complaint that he drafted and filed against LLPP and LAMPF was unfounded because he, Dr. CHARARA, and Dr. ZUCKER were fully aware of the 2010 Federal Collection Actions and Dr. CHARARA had authorized and/or consented to LLPP's and LAMPF's bringing those Actions before they were filed or, at the very least knew about them within about seven weeks after the Action Against UHC was filed and ratified the Action and the representation by LLPP and LAMPF.

277. TRAZENFELD knew about the February 8, 2011 *Outpatient Surgery* in late 2014, and still filed the litigation on behalf of GLADIOLUS in January 2015 and continued it for approximately seven more years in spite of knowing from the MWE Opinion and from Judge Gillen's orders that the amounts GLADIOLUS wanted LLPP and LAMPF to collect were probably uncollectible because they were accrued by unlawful means as warned by the MWE Opinion that SAWRAN concealed from LLPP and LAMPF and which TRAZENFELD tried to conceal. TRAZENFELD's knowledge contributed to the wrongfulness of the State Case that he commenced on behalf of GLADIOLUS.

278. Moreover, in March of 2016, TRAZENFELD knew that GLADIOLUS' State Case claims had no merit, after the depositions of Dr. CHARARA and Ms. Ambrose. The fact that

TRAZENFELD withdrew the Sawran Firm's $300,000-plus attorney's fees claim, and TRAZENFELD was fired for his grossly negligent turning over the "smoking-gun" Sawran Firm timesheets and recklessly producing the incriminating MWE Opinion, show that TRAZENFELD knew the State Case claims were meritless. The fact that TRAZENFELD dismissed the claims against the Raskins also shows his legal malice in the form of a reckless disregard for the truth in originally filing those claims.

279.  On or about November 30, 2018, Judge Gillen entered a final "Order Overruling Gladiolus' Privilege" in the state court, rejecting TRAZENFELD's efforts to take back the MWE Opinion that he had recklessly produced. TRAZENFELD knew about Judge Gillen's order but still pursued and advanced GLADIOLUS' baseless, meritless State Case for almost another four years, until September 18, 2022 when TRAZENFELD filed Plaintiff's Notice of Voluntary Dismissal Without Prejudice due to his knowledge (for eight years) that GLADIOLUS' State Case was meritless, unfounded, and unsupported by the evidence.

**E.**  *There was actual or legal malice on the part of the present Defendants in instigating, filing, or continuing the prior proceeding.*

280.  Throughout the initiation and maintenance of the State Case, TRAZENFELD demonstrated malice towards Plaintiffs, which is evident in:

281.  Actual Malice: TRAZENFELD exhibited an intent to destroy LLPP and LAMPF because GLADIOLUS' management was annoyed about having to settle with UHC for $1.8 million, and TRAZENFELD carried out their desire to spitefully take out their annoyance on LLPP and LAMPF and initiated the State Case out of vengeance and vindictive malice. Thus, TRAZENFELD exhibited actual malice towards LLPP and LAMPF.

282.  Legal Malice: TRAZENFELD filed and directly facilitated the State Case as Dr. CHARARA's and Dr. ZUCKER's baseless attempt to recoup, from the innocent LLPP and

LAMPF, the funds that GLADIOLUS had paid out in its settlement with UHC. TRAZENFELD took this matter on a contingency basis, and his greed and lust for money, publicity, and notoriety, caused him to have a reckless disregard for the truth, which exemplifies legal malice.

283.   TRAZENFELD displayed reckless disregard for the truth and for LLPP's and LAMPF's rights by drafting and filing GLADIOLUS' Complaint and First Amended Complaint to pursue claims that he knew or should have known to be baseless and unsubstantiated, and ignoring the actual facts which were contrary to GLADIOLUS' position, in the State Case.

284.   Upon information and belief, TRAZENFELD was aware that GLADIOLUS knew about the 2010 Federal Collection Actions before they were filed and, in any event, no later than February 8, 2011, and had requested that LLPP and LAMPF pursue such actions on behalf of GLADIOLUS as stated in detail in the General Allegations that are incorporated by reference.

285.   TRAZENFELD knew that the basic premise for the State Case (that GLADIOLUS allegedly did not know about or authorize the Action Against UHC and the representation by LLPP and LAMPF) was false.

286.   Thus, TRAZENFELD knew that there was a lack of probable cause for the State Case and TRAZENFELD thereby exhibited legal malice toward LLPP and LAMPF.

**F.** *The present Plaintiffs suffered damage as a result of the original proceeding.*

287.   As a direct and proximate result of the unfounded State Case, Plaintiffs incurred substantial damages. As the Florida Supreme Court held in *Debrincat v. Fischer*, 217 So. 3d 68, 70-71 (Fla. 2017), the litigation privilege does not shield a litigant (or their attorney) from a claim for malicious prosecution.

i. *Compensatory Damages*

288.   Plaintiffs suffered extensive, compensable harm, including but not limited to the examples listed in paragraphs 193-200, *supra*.

289.  Plaintiffs should be fully compensated for all of those damages and any others to be determined at trial.

ii. *Punitive Damages*

290.  TRAZENFELD knowingly initiated and pursued the meritless State Case against LLPP and LAMPF on behalf of GLADIOLUS, demonstrating clear intent to harm, and willfully continued it in bad faith for over seven years. The litigation was malicious, willful, and grossly reckless, with a specific intent to harm Plaintiffs, and resulted in severe actual harm.

291.  This conduct, motivated by a personal vendetta against LLPP and LAMPF, exhibits both actual malice and legal malice, arising from a lack of probable cause or intentional misconduct and/or gross negligence, indicating a wanton and reckless disregard for Plaintiffs' rights while aware of the likelihood of harm.

292.  TRAZENFELD's intentional, willful disregard for Plaintiffs' rights constitutes a public wrong. TRAZENFELD's egregious actions involving intentional misconduct or gross negligence merit punitive damages to penalize Defendant for the severe and irreparable harm inflicted and/or to deter future conduct.

293.  WHEREFORE, Plaintiffs, STEPHEN LAMPF and LAMPF, LIPKIND, PRUPIS & PETIGROW, P.A., seek judgment for Malicious Prosecution in this action against **WARREN R. TRAZENFELD**, for damages in an amount to be determined at trial (but far more than $75,000 exclusive of pre-judgment interest, costs and attorneys' fees), along with punitive damages in an amount to be determined by the jury but not less than six million dollars ($6,000,000.00) (for which Defendant TRAZENFELD should be jointly and severally liable with the other Defendants), and Plaintiffs request prejudgment and post-judgment interest at the highest rate allowable by law, along with attorney's fees, costs, and any and all other relief that this Honorable Court deems just, equitable, and proper.

## COUNT V: MALICIOUS PROSECUTION
(Plaintiffs Against **JAMES C. SAWRAN**)

294.  Plaintiffs incorporate, adopt, repeat, and reallege paragraphs 1-200 as if fully stated herein against **SAWRAN**.

> **A.** *A civil judicial proceeding was previously commenced or continued against the present Plaintiffs.*

295.  Upon information and belief, SAWRAN, as attorney for GLADIOLUS SURGERY CENTER, L.L.C., helped plan or prepare the baseless civil lawsuit that TRAZENFELD filed on behalf of GLADIOLUS on or about January 30, 2015—the Florida "State Case" described in the General Allegations.

> **B.** *The present Defendant was the legal cause of the original proceeding against the present Plaintiffs as defendants in the State Case; i.e., the proceeding was commenced or instigated by the present Defendant.*

296.  SAWRAN instigated the scheme to file the State Case, in cooperation with Dr. CHARARA and Dr. ZUCKER and TRAZENFELD, against LLPP and LAMPF in January 2015, about two months after GLADIOLUS' settlement with UHC in November 2014.

297.  Further, SAWRAN spurred and encouraged GLADIOLUS' annoyance about paying out $1.8 million in a settlement with UHC and, in legal causation of the original proceeding, SAWRAN encouraged and incited GLADIOLUS to pursue the State Case against LLPP and LAMPF in spite of knowing that it was meritless, unfounded, and harmful.

> **C.** *The termination of the State Case constituted a bona fide termination of that proceeding in favor of the present Plaintiffs; i.e., the proceeding was ended in favor of the present Plaintiffs.*

298.  As noted in paragraphs 181-184, *supra*, GLADIOLUS took the voluntary dismissal of its claims on September 18, 2022, because there was not a factual basis to support the claims and because GLADIOLUS did not have probable cause or an evidentiary basis to support the

allegations. Accordingly, the State Case concluded in a termination that was bona fide and was in favor of LLPP and LAMPF; and the statute of limitations to re-file the suit or bring a new suit has long expired.

> **D.** *There was an absence of probable cause to file or maintain the original proceeding.*

299. As shown in the General Allegations, SAWRAN could not have had any reasonable belief in the merits of GLADIOLUS' claims that would be made in the State Case because SAWRAN and Dr. CHARARA and Dr. ZUCKER knew that they lacked supporting evidence, and knew that the claims were false and contrary to the actual facts.

300. On information and belief, SAWRAN had vindictive motives for assisting GLADIOLUS with planning the lawsuit that became the State Case, thus assisting Dr. CHARARA and Dr. ZUCKER with taking out their annoyance on LLPP and LAMPF and preparing to pursue a baseless attempt to recoup, from the innocent LLPP and LAMPF, the funds that GLADIOLUS had paid out in its settlement with UHC. Therefore, SAWRAN had to be aware that GLADIOLUS lacked probable cause for the State Case which would be commenced.

> **E.** *There was actual or legal malice on the part of the present Defendants in instigating, filing, or continuing the prior proceeding.*

301. In helping to instigate the State Case, SAWRAN demonstrated malice towards Plaintiffs, which is evident in:

302. Actual Malice: SAWRAN exhibited an intent to harm LLPP and LAMPF on behalf of GLADIOLUS because GLADIOLUS' management was annoyed about having to settle with UHC for $1.8 million, and, on information and belief, SAWRAN advised them to carry out their desire to take out their annoyance on LLPP and LAMPF out of spite. Thus, SAWRAN exhibited actual malice towards LLPP and LAMPF.

303. Legal Malice: SAWRAN displayed a reckless disregard for the truth and for

LLPP's and LAMPF's rights by advising or instigating GLADIOLUS to plan and pursue a lawsuit against LLPP and LAMPF in the State Case, when SAWRAN knew that the premise of the claims were baseless and unsubstantiated. Thus, SAWRAN knew that there was a lack of probable cause for the State Case and SAWRAN thereby exhibited legal malice toward LLPP and LAMPF.

**F.** *The present Plaintiffs suffered damage as a result of the original proceeding.*

304.   As a direct and proximate result of the unfounded State Case, Plaintiffs incurred substantial damages.

### i. *Compensatory Damages*

305.   Plaintiffs suffered extensive, compensable harm, including but not limited to the examples listed in paragraphs 193-200, *supra*.

306.   Plaintiffs should be fully compensated for all of those damages and any others to be determined at trial.

### ii. *Punitive Damages*

307.   SAWRAN incited GLADIOLUS to improperly file the baseless State Case while knowing that it was based on falsehoods and was not supported by the facts. On information and belief, SAWRAN acted out of a personal vendetta against LLPP and LAMPF, further showing malicious intent. SAWRAN also actively concealed the MWE Opinion from LLPP and LAMPF.

308.   SAWRAN knowingly helped initiate the meritless State Case against LLPP and LAMPF on behalf of GLADIOLUS, demonstrating clear intent to harm Plaintiffs. The litigation was malicious, willful, and grossly reckless, with a specific intent to harm Plaintiffs, and resulted in severe actual harm.

309.   This conduct, motivated by a personal vendetta against LLPP and LAMPF, exhibits both actual malice and legal malice, arising from a lack of probable cause or intentional

misconduct and/or gross negligence, indicating a wanton and reckless disregard for Plaintiffs' rights while aware of the likelihood of harm.

310.   SAWRAN's intentional, willful disregard for Plaintiffs' rights constitutes a public wrong. SAWRAN's egregious actions involving intentional misconduct or gross negligence merit punitive damages to penalize Defendant for the severe and irreparable harm inflicted and/or to deter future conduct.

311.   WHEREFORE, Plaintiffs, STEPHEN LAMPF and LAMPF, LIPKIND, PRUPIS & PETIGROW, P.A., seek judgment for Malicious Prosecution in this action against **JAMES C. SAWRAN**, for damages in an amount to be determined at trial (but far more than $75,000 exclusive of pre-judgment interest, costs and attorneys' fees), along with punitive damages in an amount to be determined at trial but not less than six million dollars ($6,000,000.00) (for which Defendant SAWRAN should be jointly and severally liable along with the other Defendants), and Plaintiffs request prejudgment and post-judgment interest at the highest rate allowable by law, along with attorney's fees, costs, and any and all other relief that this Honorable Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

312.   Plaintiffs hereby demand trial by jury as to all claims or counts so triable.

DATED: <u>April 9, 2024</u>.

                                        Respectfully submitted,

ZIBELMAN LEGAL ASSOCIATES P.C
*Attorneys for Stephen Lampf and for Lampf, Lipkind,*
*Prupis & Petigrow, P.A.*
1500 J.F. Kennedy Boulevard, Suite 1030
Philadelphia, PA 19102
215-569-0600  Telephone
215-569-1175  Facsimile
Alan@ziblaw.com  E-mail

<u>/s/ *Alan R. Zibelman*       </u>
Alan Zibelman, Esq.
Fla. Bar No. 0998176

EXHIBITS

**EXHIBIT A**

# Outpatient Surg

## Outpatient

Ours Will.
We Guarantee It!

Image
HEALTHCARE LAUNDRY SPECIALISTS
LEARN MORE

Save the Date for OR Excellence
October 11-13, 2017
Red Rock Casino, Resort & Spa, Las Vegas, NV.

MENU

Home > News > February, 2011

## ASCs Sue Insurers for Denying Manipulation Under Anesthesia Claims

2 Florida facilities that performed chiropractic procedure are seeking "many hundreds of thousands of dollars."

Published: February 8, 2011
Category: Outpatient Surgery > General Anesthesia

Manipulation under anesthesia, the controversial and lucrative chiropractic procedure that involves lightly anesthetizing patients so that you can twist, bend and adjust them in an effort to improve or even restore range of motion, is at the center of a lawsuit pitting 2 Florida surgery centers against 4 of the country's leading insurers.

In one corner, you have Sanctuary Surgical Centre in Boca Raton and Gladiolus Surgery Center in Fort Myers claiming that payors first reduced and later denied their out-of-network claims for manipulation under anesthesia, otherwise known as MUA, despite giving the ASCs pre-authorizations and pre-certification for individual patients' MUA procedures. The ASCs are hoping to collect "many hundreds of thousands of dollars," says Stephen Lampf of Lampf, Lipkind, Prupis & Petigrow in West Orange, N.J.

In the other corner, you have Aetna, United Healthcare, Cigna and Blue Cross, which ceased reimbursing the ASCs for MUA in late 2007 because, the suit claims, MUA is "experimental, investigatory, not medically necessary" or not "a covered benefit under the plan."

Performed by either an osteopath or an orthopedic surgeon with a chiropractor in the room assisting, MUA typically requires 3 consecutive days of treatment, each treatment lasting around 30 minutes. Reimbursement ranges from $25,000 to $60,000 per patient, says Mr. Lampf. The insurers reimbursed for the procedures when the ASCs began performing them in late 2006. Months later, however, the payors began discounting the MUA claims. Soon thereafter, they began systematically denying all MUA claims, says Mr. Lampf.

"Our position is that the insurance companies said one day, 'We're not paying for it.' They violated their own contracts," says Mr. Lampf. "We believe it was arbitrary, capricious and violates federal law."

Efforts to reach attorneys representing the payors were unsuccessful. Phone messages left with the ASCs were not returned.

Critics of MUA call it a lucrative and largely unnecessary procedure. Supporters say it's been practiced safely and successfully for years on patients who don't respond to more conventional treatment.

Incidentally, Gladiolus Surgery Center stopped accepting patients on a voluntary basis last year after state inspectors found problems that could be harmful to the health and safety of patients, according to state records. The center has since reopened.

*Dan O'Connor*

© Copyright Herrin Publishing Partners LP. REPRODUCTION OF THIS COPYRIGHTED CONTENT IS STRICTLY PROHIBITED. We encourage LINKING to this content; view our linking policy here.

Also in the News...

*Pain Management Doc Takes Stand in Meningitis Murder Trial*
*Neurosurgeon Driven by Greed Gets 20-Year Prison Sentence*
*Million-Dollar Lawsuit Claims Surgical Fire Ruined 86-Year-Old Woman's Life*
*Prosecutor: New England Compounding Center President Viewed Company as His "Personal ATM Machine"*
*UnitedHealth Acquires Surgical Care Affiliates in $2.3 Billion Deal*
*Trial to Begin for Pharmacist Linked to Deadly Fungal Meningitis Outbreak*
*FDA: Battery-Powered Mobile Medical Carts Could Be a Fire Hazard*

New to Outpatient Surgery Magazine?



**Eliminate Flashing Forever**

Advertisement



SONY

SURGERY HAS A WHOLE
NEW DIMENSION. 4K 3D

*OTHER ARTICLES THAT MAY INTEREST YOU*

The Future of Anesthesia
Our experts weigh in on the innovations, attitudes and practices they see down the road.
Have You Checked Out Anesthesia Machines Lately?
Today's innovative workstations are built for safety and efficiency.
Study: Dopamine Quickens Recovery From Anesthesia

**Stephen Lampf**

EXHIBIT B

| | |
|---|---|
| **From:** | Liva5 <liva5@yahoo.com> |
| **Sent:** | Wednesday, September 03, 2014 2:35 PM |
| **To:** | Stephen Lampf |
| **Subject:** | Fwd: Fw: |

Chris Liva

Begin forwarded message:

> **From:** Christopher Liva <liva5@yahoo.com>
> **Date:** September 3, 2014 at 2:20:37 PM EDT
> **To:** Chris Liva <liva5@yahoo.com>
> **Subject: Fw:**

--- On Tue, 2/8/11, Lorraine Schroder <lschroder@gscfl.com> wrote:

From: Lorraine Schroder <lschroder@gscfl.com>

Subject:

To: liva5@yahoo.com

Date: Tuesday, February 8, 2011, 4:23 PM

This Just In from Outpatient Surgery:

ASCs Sue Insurers for Denying Manipulation Under
Anesthesia Claims Manipulation under anesthesia,
the controversial and lucrative chiropractic procedure that
involves lightly anesthetizing patients so that you can
twist, bend and adjust them in an effort to improve or even
restore range of motion, is at the center of a lawsuit
pitting 2 Florida surgery centers against 4 of the
country's leading insurers. Read the full story
at http://www.outpatientsurgery.net/news/2011/02/7-ascs-sue-insurers-for-
denying-manipulation-under-anesthesia-claims.

Lorraine AmbroseAdministratorGladiolus Surgery Center7431 Gladiolus
DriveFt.
Myers, FL 33908Phone: 239-689-7000Fax: 239-689-7007

EXHIBIT C



# MOBILITY USAGE

AT&T has queried for records using Eastern Time Zone. AT&T's records are stored and provided in UTC.

Run Date: 04/25/2016
Run Time: 3:15:48
Voice League No: 12394170-1944
Account Number: 2391120147926

1995754
04/25/2016
SCAMP

| Item | Conn. Date | Conn. Time (UTC) | Seizure Time | ET | Originating Number | Terminating Number | IMEI | IMSI | CT | Feature |
|------|-----------|------------------|--------------|-----|--------------------|--------------------|------|------|-----|---------|
| 18391 | 02/08/11 | 03:07:53 | 0:04 | 5:49 | 12394701944 | 18005540293 | 0119340077648710 APPLE IPHONE3G | 310410250357401 | MO | [MTOR] |
| 18392 | 02/08/11 | 12:56:31 | 0:13 | 1:03 | 11357702231 | 12394701944 | 0119340077648710 APPLE IPHONE3G | 310410250357401 | MT | [MTOP] |
| 18393 | 02/08/11 | 12:56:01 | 0:21 | 1:00 | 12394704231 | 12394701944 | 0119340077648710 APPLE IPHONE3G | 310410250357401 | MO | [MTOR] |
| 18394 | 02/08/11 | 13:31:16 | 0:35 | 1:04 | 12346901000 | 12394701944 | 0119340077648710 APPLE IPHONE3G | 310410250357401 | MT | [MTOP] |
| 18395 | 02/08/11 | 13:32:29 | 0:07 | 1:27 | 12394701944 | 12395897060 | 0119340077648710 APPLE IPHONE3G | 310410250357401 | MO | [MTOR] |
| 18396 | 02/08/11 | 15:27:11 | 0:14 | 0:50 | 12394701944 | 12397729630 | 0119340077648710 APPLE IPHONE3G | 310410250357401 | MO | [MTOR] |
| 18397 | 02/08/11 | 19:47:43 | 0:10 | 6:00 | 12398065933 | 12394701944 | 0119340077648710 APPLE IPHONE3G | 310410250357401 | MO | [MTOR] |
| 18398 | 02/08/11 | 19:47:42 | 0:06 | 0:00 | 12398065933 | 12394701944 | 0119340077648710 APPLE IPHONE3G | 310410250357401 | MO | [MTOP] |
| 18399 | 02/08/11 | 20:20:45 | 0:14 | 1:42 | 19543323800 | 12394701944 | 0119340077648710 APPLE IPHONE3G | 310410250357401 | MT | [MTOP] |
| 18400 | 02/08/11 | 20:24:23 | 0:05 | 10:27 | 15614457303 | 12394701944 | 0119340077648710 APPLE IPHONE3G | 310410250357401 | MT | [MTOP] |
| 18401 | 02/08/11 | 21:05:19 | 0:11 | 9:28 | 12394704231 | 12394701944 | 0119340077648710 APPLE IPHONE3G | 310410250357401 | MO | [MTOR] |
| 18402 | 02/08/11 | 21:05:19 | 0:09 | 9:28 | 12394704231 | 12394701944 | 0119340077648710 APPLE IPHONE3G | 310410250357401 | MT | [MTDP] |
| 18403 | 02/08/11 | 21:11:09 | 0:00 | 0:00 | 19543323800 13059728655 1F* | 12394701944 | | 310410250357401 | MT | [MTOP VM: CTMA: cbn] |
| 18404 | 02/08/11 | 21:11:09 | 0:01 | 0:04 | 12394701944 | 13059728655 | 0119340077648710 APPLE IPHONE3G | 310410250387401 | SO | [VM:DOR] |
| 18405 | 02/08/11 | 21:11:09 | 0:23 | 0:04 | 19543323800 | 12394701944 | | 310410250387401 | ST | [DOR] |
| 18406 | 02/08/11 | 21:11:11 | 0:00 | 0:00 | 12394701944 | -1 | 0119340077648710 APPLE IPHONE3G | 310410250387401 | MO | [] |
| 18407 | 02/08/11 | 21:15:20 | 0:14 | 0:21 | 12394701944 | 19547323800 | | 310410250387401 | MO | [MTOR] |
| 18408 | 02/08/11 | 21:44:50 | 0:07 | 6:25 | 15614457303 | 12394701944 | 0119340077648710 APPLE IPHONE3G | 310410250357401 | MT | [MTOP] |

AT&T Proprietary

The information contained here is for use by authorized persons only and is not for general distribution.

ACK